## LOCAL NO. 82, FURNITURE & PIANO MOVING, FURNITURE STORE DRIVERS, HELPERS, WAREHOUSEMEN & PACKERS, ET AL. *v.* CROWLEY ET AL.

No. 82–432.   Argued January 9, 1984—Decided June 12, 1984

Gary S. Witlen argued the cause for petitioners. With him on the briefs was David Previant.

John H. Garvey argued the cause for the federal respondent under this Court's Rule 19.6, urging reversal. With him on the briefs were Solicitor General Lee, Deputy Solicitor General Geller, T. Timothy Ryan, Jr., Karen I. Ward, Mary-Helen Mautner, and John A. Bryson.

Mark D. Stern argued the cause for respondents Crowley et al. With him on the brief was Kurt M. Pressman.*

JUSTICE BRENNAN delivered the opinion of the Court.

The Labor-Management Reporting and Disclosure Act of 1959 (LMRDA or Act), 73 Stat. 522, as amended, 29 U. S. C. § 401 et seq., was Congress' first major attempt to regulate the internal affairs of labor unions. Title I of the Act provides a statutory "Bill of Rights" for union members, including various protections for members involved in union elections, with enforcement and appropriate remedies available in district court. Title IV, in contrast, provides an elaborate postelection procedure aimed solely at protecting union democracy through free and democratic elections, with primary responsibility for enforcement lodged with the Secretary of Labor. Resolution of the question presented by this case requires that we address the conflict that exists between the separate enforcement mechanisms included in these two Titles. In particular, we must determine whether suits alleging violations of Title I may properly be maintained in district court during the course of a union election.

The Court of Appeals approved a preliminary injunction issued by the District Court that enjoined an ongoing union

---

*J. Albert Woll and Laurence Gold filed a brief for the American Federation of Labor and Congress of Industrial Organizations as amicus curiae urging reversal.

Arthur L. Fox II and Alan B. Morrison filed a brief for Union Democracy as amicus curiae urging affirmance.

election and ordered the staging of a new election pursuant to procedures promulgated by the court. After reviewing the complex statutory scheme created by Congress, we conclude that such judicial interference in an ongoing union election is not appropriate relief under § 102 of Title I, 29 U. S. C. § 412. We therefore reverse the Court of Appeals.

# I

Local No. 82, Furniture and Piano Moving, Furniture Store Drivers, Helpers, Warehousemen, and Packers (Local 82) represents approximately 700 employees engaged in the furniture moving business in the Boston, Mass., area.[1] The union is governed by a seven-member executive board whose officers, pursuant to § 401(b) of the LMRDA, 29 U. S. C. § 481(b), must be chosen by election no less than once every three years. These elections, consistent with the executive board's discretion under the union's bylaws and constitution, have traditionally been conducted by mail referendum balloting. The dispute giving rise to the present case stems from the union election that was regularly scheduled for the last two months of 1980.

On November 9, 1980, Local 82 held a meeting to nominate candidates for positions on its executive board. The meeting generated considerable interest, in part because dissident members of the union were attempting to turn the incumbent union officials out of office. Two aspects of the controversial meeting are especially important for present purposes. First, admission to the meeting was restricted to those members who could produce a computerized receipt showing that their dues had been paid up to date. Several union members, including respondent Jerome Crowley, were prohibited from entering the meeting because they did not have such dues receipts in their possession. Second, during the actual

---

[1] Also appearing as petitioners before this Court are George Harris, former president of Local 82, Bart Griffiths, secretary-treasurer of Local 82, Phillip Piemontese, chairman of the election committee of Local 82, and several unidentified members of that election committee.

nominations process, there was disagreement relating to the office for which respondent John Lynch had been nominated. At the close of nominations, petitioner Bart Griffiths, the union's incumbent secretary-treasurer, declared himself the only candidate nominated for that office; at the same time, he included Lynch among the candidates selected to run for union president.

Several dissatisfied members of the union, now respondents before this Court,[2] filed a protest with the union. On November 20, their protest was denied by Local 82.[3] Election ballots were thereafter distributed to all members of the union, who were instructed to mark and return the ballots by mail so that they would arrive in a designated post office box by 9 a. m. on December 13, 1980, at which time they were scheduled to be counted. Respondent Lynch's name appeared on the ballot as a candidate for president, and not for secretary-treasurer.

On December 1, 1980, after the distribution of ballots had been completed, the respondents filed this action in the United States District Court for the District of Massachusetts. They alleged, *inter alia*, that Local 82 and its officers had violated several provisions of Title I of the LMRDA, and sought a preliminary injunction. In particular, the respondents claimed that restricting admission to the nominations meeting to those members who could produce computerized dues receipts violated their "equal rights . . . to nominate

---

[2] In addition to Jerome Crowley and John Lynch, respondents before this Court include Anthony Coyne, Joseph Fahey, Robert Lunnin, James Hayes, Gerald Owens, Joseph Trask, Joseph Montagna, and Dennis Bates.

[3] The respondents also filed protests with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, the international union with which Local 82 is affiliated, and with Teamsters Joint Council 10, the regional body containing Local 82. No action was ever taken by the international union, and a hearing scheduled by the regional body for December 23, 1980, was canceled after the present lawsuit was filed.

candidates [and] to attend membership meetings" under § 101(a)(1) of the Act,[4] as well as their right freely to express views at meetings of the union under § 101(a)(2) of the Act.[5] They also alleged that the union and its officers had violated § 101(a)(1) by failing to recognize respondent Lynch as a candidate for secretary-treasurer.[6]

---

[4] Section 101(a)(1) of the LMRDA provides in full:

"EQUAL RIGHTS.—Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws."   73 Stat. 522, 29 U. S. C. § 411(a)(1).

[5] Section 101(a)(2) of the LMRDA provides in full:

"FREEDOM OF SPEECH AND ASSEMBLY.—Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided,* That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations." 73 Stat. 522, 29 U. S. C. § 411(a)(2).

[6] Several other claims under both Title I and Title IV of the LMRDA were asserted in the respondents' original complaint.   These included allegations that the union failed to notify members about the nominations meeting, that the union unlawfully limited candidate eligibility to members who had timely paid their dues during the preceding 24 months, and that the union's disciplinary proceedings against respondent Lunnin were an unlawful reprisal for the exercise of rights guaranteed by the Act.   A later amendment to the complaint added, *inter alia,* a claim that the union had increased dues several times since September 1976 without complying with the requirements set forth in § 101(a)(3) of the Act, 73 Stat. 522, 29 U. S. C. § 411(a)(3).   For a variety of reasons, however, the District Court refused to grant preliminary relief on any of these claims, and they are not now before the Court.

After preliminary papers were filed, on December 12 the District Court issued a temporary restraining order to preserve the status quo and to protect its own jurisdiction. See App. 40–47. Given that the next morning (December 13) was the pre-established deadline for voting, many, if not most, of the ballots had already been returned by the union's voting members. Nonetheless, the court noted that federal-court jurisdiction was available under § 102 of Title I, 29 U. S. C. § 412, for claims alleging discriminatory application of union rules. Moreover, the court's order specifically required that the ballots be sealed and delivered to the court, thereby preventing the petitioners from counting the ballots until a final determination could be made on the motion for a preliminary injunction.

Several days of hearings on the preliminary injunction, and several months of negotiations concerning an appropriate court order to accompany that injunction, followed. Finally, on July 13, 1981, the District Court issued a preliminary injunction accompanied by a memorandum opinion. 521 F. Supp. 614 (1981). The court first addressed more fully the petitioners' argument that, because the challenged conduct concerned the procedures for conducting union elections, the respondents' exclusive remedy was to file a complaint with the Secretary of Labor under Title IV. The court rejected this argument, noting that, "at least with respect to actions challenging pre-election conduct, Title I of the LMRDA establishes an alternative enforcement mechanism for remedying conduct interfering with a member's right to engage in the activities associated with union democracy." *Id.*, at 621 (footnote omitted). Therefore, the court concluded, it could properly invoke its jurisdiction under Title I, if only for those claims concerning dues receipts and the nomination of respondent Lynch that are now before this Court. *Id.*, at 622–623. Because the suit concerned disputes arising out of a nominations meeting conducted in preparation for a union election, and given that the court had issued a temporary

restraining order barring actual completion of the election, Title I jurisdiction could properly be asserted over this "pre-election conduct." *Id.*, at 621, n. 12.

After concluding that the respondents had demonstrated a substantial likelihood of success on their claims,[7] the court issued its comprehensive injunction.[8] The court explicitly intended to issue an order that "interfere[d] as little as possible with the nomination and election procedures" required by the union's constitution and bylaws, *id.*, at 634; moreover, the terms of the preliminary injunction were derived in large part from an ongoing process of negotiations and hearings that the court had conducted with the parties during the preceding six months. Nonetheless, the order declared the ballots cast in December 1980 to be "legally without effect," *id.*, at 636, n., and provided detailed procedures to be followed by the union during a new nominations meeting and a subsequent election. Among other things, the order selected an outside group of arbitrators to conduct and supervise the election, and set forth eligibility requirements for attending the nominations meeting, being a candidate for office, and

[7] In particular, the court found that the dues receipt requirement for entry into the nominations meeting was "suddenly announced," was applied "in a discriminatory fashion," and was "imposed in retaliation for [the respondcnts'] expressed intention to nominate candidates to oppose the incumbent Local officers and with the objective of suppressing dissent within the Local." 521 F. Supp., at 627. The court also found that, despite being listed as a candidate for union president, respondent Lynch had actually been nominated for secretary-treasurer. *Ibid.* Finally, the court found that irreparable harm to the respondents would result if a new nominations meeting and election were not held, that the burdens imposed on the petitioners by preliminary relief were sufficiently mitigated by the full hearing accorded their arguments, and that the public interest in union democracy would be served by granting such relief. *Id.*, at 627–628. None of these findings is being challenged before this Court. See n. 9, *infra.*

[8] The complete terms of the preliminary injunction are reported at the end of the District Court's decision, see 521 F. Supp., at 636–638, n., and as an appendix to the decision issued by the Court of Appeals, see 679 F. 2d 978, 1001–1004 (CA1 1982).

voting.  The order also provided that it would remain in effect until further order of the District Court.

The petitioners appealed, and the Secretary of Labor, who until then had not participated in the proceedings, intervened on their behalf.  They argued that the District Court lacked authority under Title I to enjoin the tabulation of ballots and order new nominations and elections under court supervision. The Court of Appeals rejected these arguments, however, and affirmed in all respects.  679 F. 2d 978 (CA1 1982).  It agreed with the District Court that Title I remedies are not foreclosed when violations of Title I occur during the course of an election.  The court also held that § 403 of the Act, which explicitly provides that Title IV's remedies are exclusive for elections that are "already conducted," 29 U. S. C. § 483, does not apply until all the ballots have actually been tabulated.[9]

Writing in dissent, Judge Campbell was "unable to read Title I as extending so far as to allow a district court, once balloting has commenced, to invalidate an election and order a new one under its supervision and under terms and conditions extemporized by the courts and parties."  679 F. 2d, at 1004.  He believed that "the proper accommodation between Title I and Title IV requires consideration not only of the stage which the election process has reached but [also] the nature of the relief" requested and granted.  *Id.*, at 1005.

Because of the confusion evident among the lower federal courts that have tried to reconcile the remedial provisions

---

[9] The Court of Appeals further concluded that "the district court committed no clear error" when finding that there existed substantial proof that the petitioners violated the provisions of Title I by imposing the dues receipt requirement and by mishandling the nomination of respondent Lynch.  679 F. 2d, at 995.  See n. 7, *supra*.  The petitioners have not challenged that ruling in this Court.  Our decision therefore assumes that the respondents have demonstrated a substantial likelihood of success on their two Title I claims.

under Title I and Title IV of the Act,[10] we granted certiorari. 459 U. S. 1168 (1983). We now reverse.[11]

## II

To examine fully the relationship between the respective enforcement provisions of Title I and Title IV of the

---

[10] See, e. g., *Kupau* v. *Yamamoto*, 622 F. 2d 449 (CA9 1980); *Driscoll* v. *International Union of Operating Engineers*, 484 F. 2d 682 (CA7 1973); *Schonfeld* v. *Penza*, 477 F. 2d 899 (CA2 1973); *McDonough* v. *Local 825, International Union of Operating Engineers*, 470 F. 2d 261 (CA3 1972). See also, e. g., James, Union Democracy and the LMRDA: Autocracy and Insurgency in National Union Elections, 13 Harv. Civ. Rights–Civ. Lib. L. Rev. 247 (1978); Comment, Titles I and IV of the LMRDA: A Resolution of the Conflict of Remedies, 42 U. Chi. L. Rev. 166 (1974); Note, Pre-election Remedies Under the Landrum-Griffin Act: The "Twilight Zone" Between Election Rights Under Title IV and the Guarantees of Titles I and V, 74 Colum. L. Rev. 1105 (1974).

[11] For two separate reasons, the respondents seek to have the writ of certiorari dismissed as improvidently granted or, in the alternative, the case dismissed because it no longer presents a live controversy. We decline, however, to follow either course.

First, the respondents claim that, by filing certain "stipulations" with the District Court, Local 82 effectively consented to the running of a new election, thereby foreclosing any challenge to that court's order requiring a new election. See, e. g., App. 55 ("Local 82 is prepared to and will conduct a second nomination and mail ballot election for the election of officers under the following terms, provided the Court permits a change in the status quo preserved by its Order of December 12, 1980"). Neither the District Court nor the Court of Appeals, however, considered these conditional stipulations to be binding on Local 82. The District Court, for example, consistently recognized that, although agreeing to rerun the election under its own procedures, Local 82 had not waived its challenge to the authority or jurisdiction of the District Court to order a new election pursuant to court-imposed terms and conditions. See *id.*, at 110–112. And the Court of Appeals explicitly found that "these were not true factual stipulations narrowing the factual dispute but offers of settlement to which [Local 82] agreed to be bound, if [respondents] so agreed." 679 F. 2d, at 996, n. 22. We see no reason to disturb these conclusions.

Second, the respondents claim that the entire case is moot because not only has the election ordered by the District Court taken place, but also the

LMRDA, it is necessary first to summarize the relevant statutory provisions and Congress' principal purposes in their enactment. The LMRDA was "the product of congressional concern with widespread abuses of power by union leadership." *Finnegan* v. *Leu*, 456 U. S. 431, 435 (1982). Although the Act "had a history tracing back more than two decades," *ibid.*, and was directly generated by several years of congressional hearings, see S. Rep. No. 187, 86th Cong., 1st Sess., 2 (1959) (hereafter S. Rep. No. 187), many specific provisions did not find their way into the Act until the proposed legislation was fully considered on the floor of the Senate, 456 U. S., at 435, n. 4. It should not be surprising, therefore, that the interaction between various provisions that were finally included in the Act has generated considerable uncertainty.

A

Chief among the causes for this confusion is Title I of the Act, which provides union members with an exhaustive "Bill of Rights" enforceable in federal court. §§ 101–105, 29 U. S. C. §§ 411–415. In particular, Title I is designed to guarantee every union member equal rights to vote and otherwise participate in union decisions, freedom from unrea-

---

term to be served by the officers chosen in that election has now elapsed. We have previously held, however, that the intervention of another election does not terminate the Secretary of Labor's authority under Title IV of the LMRDA to seek invalidation of the preceding election. *Wirtz* v. *Glass Bottle Blowers Assn.*, 389 U. S. 463 (1968); *Wirtz* v. *Laborers*, 389 U. S. 477 (1968). If the District Court acted beyond its authority in ordering and supervising a new election, then the ballots that were never counted in December 1980 but were sealed pursuant to the District Court's order could be tabulated, and the Secretary's remedies under Title IV would come into play. Moreover, we note that there are still pending several important collateral matters, including claims for damages, attorney's fees, and costs, that are dependent upon the propriety of the District Court's preliminary injunction. See Reply Brief for Petitioners 7–9. We have no doubt, therefore, that the present controversy has not been mooted by intervening circumstances.

sonable restrictions on speech and assembly, and protection from improper discipline. See *Finnegan* v. *Leu, supra,* at 435–436; *Steelworkers* v. *Sadlowski,* 457 U. S. 102, 109–110 (1982). Given these purposes, there can be no doubt that the protections afforded by Title I extend to union members while they participate in union elections. As we have previously noted:

> "Congress adopted the freedom of speech and assembly provision [§ 101(a)(2), 29 U. S. C. § 411(a)(2)] in order to promote union democracy. It recognized that democracy would be assured only if union members are free to discuss union policies and criticize the leadership without fear of reprisal. Congress also recognized that this freedom is particularly critical, and deserves vigorous protection, in the context of election campaigns. For it is in elections that members can wield their power, and directly express their approval or disapproval of the union leadership." *Sadlowski, supra,* at 112 (citations omitted).

As first introduced by Senator McClellan on the floor of the Senate, see 105 Cong. Rec. 6469–6476, 6492–6493 (1959), Title I empowered the Secretary of Labor to seek injunctions and other relief in federal district court to enforce the rights guaranteed to union members. A few days later, however, the McClellan amendment was replaced by a substitute amendment offered by Senator Kuchel. See *id.,* at 6693–6694, 6717–6727. Among the principal changes made by this substitute was to provide for enforcement of Title I through suits by individual union members in federal district court. *Id.,* at 6717, 6720.[12] As so amended, the legislation

---

[12] Senator Kuchel explained that this was "one of the major changes in the proposal. The [McClellan] amendment . . . provided that the Secretary of Labor might, on behalf of the injured or aggrieved member, have the right to litigate the alleged grievance and to seek an injunction or other relief. We believe that giving this type of right to the aggrieved employee

was endorsed in the Senate by a vote of 77–14, *id.*, at 6727, and was quickly accepted without substantive change by the House, see H. R. 8400, 86th Cong., 1st Sess., § 102 (1959); H. R. Conf. Rep. No. 1147, 86th Cong., 1st Sess., 31 (1959) (hereafter H. R. Conf. Rep. No. 1147). In relevant part, therefore, § 102 of the Act now provides:

> "Any person whose rights secured by the provisions of this title have been infringed by any violation of this title may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate." 73 Stat. 523, 29 U. S. C. § 412.

Standing by itself, this jurisdictional provision suggests that individual union members may properly maintain a Title I suit whenever rights guaranteed by that Title have been violated.[13] At the same time, however, § 102 explicitly limits the relief that may be ordered by a district court to that which is "appropriate" to any given situation. See *Hall* v. *Cole*, 412 U. S. 1, 10–11 (1973).

## B

Nor would it be appropriate to interpret the enforcement and remedial provisions of Title I in isolation. In particular,

---

member himself is in the interest of justice, and therefore we propose to eliminate from the bill the right of the Secretary of Labor to sue in his behalf." 105 Cong. Rec. 6720 (1959).

This aspect of the Kuchel amendment apparently received widespread support, not only from Senators who feared that the McClellan amendment's enforcement procedures would set a precedent for federal intervention in all civil rights matters, see, *e. g., id.*, at 6696 (statement of Sen. Johnston), but also from Senators who wished to limit federal interference with the internal affairs of labor unions, see, *e. g., id.*, at 6726 (statement of Sen. Kefauver). See Aaron, The Labor-Management Reporting and Disclosure Act of 1959, 73 Harv. L. Rev. 851, 859, 875 (1960).

[13] Allowance for actions under Title I is only narrowly circumscribed by procedural requirements such as exhaustion. Compare § 101(a)(4), 29 U. S. C. § 411(a)(4), with *NLRB* v. *Marine Workers*, 391 U. S. 418, 426–428 (1968).

Title IV of the LMRDA specifically regulates the conduct of elections for union officers, and therefore protects many of the same rights as does Title I. See §§ 401–403, 29 U. S. C. §§ 481–483. Title IV "sets up a statutory scheme governing the election of union officers, fixing the terms during which they hold office, requiring that elections be by secret ballot, regulating the handling of campaign literature, requiring a reasonable opportunity for the nomination of candidates, authorizing unions to fix 'reasonable qualifications uniformly imposed' for candidates, and attempting to guarantee fair union elections in which all the members are allowed to participate." *Calhoon* v. *Harvey*, 379 U. S. 134, 140 (1964).[14] In general terms, "Title IV's special function in furthering the overall goals of the LMRDA is to insure 'free and democratic' elections," *Wirtz* v. *Glass Bottle Blowers Assn.*, 389 U. S. 463, 470 (1968), an interest "vital" not only to union members but also to the general public, *id.*, at 475. See *Wirtz* v. *Laborers*, 389 U. S. 477, 483 (1968).

Although Congress meant to further this basic policy with a minimum of interference in the internal affairs of unions, see *Calhoon, supra,* at 140, § 402 of Title IV contains its own comprehensive administrative and judicial procedure for enforcing the standards established in that Title of the Act, 29 U. S. C. § 482. See *Dunlop* v. *Bachowski*, 421 U. S. 560 (1975); *Trbovich* v. *Mine Workers*, 404 U. S. 528, 531 (1972); *Calhoon, supra,* at 138–140. "Any union member who alleges a violation [of Title IV] may initiate the enforcement procedure. He must first exhaust any internal remedies available under the constitution and bylaws of his union. Then he may file a complaint with the Secretary of Labor, who 'shall investigate' the complaint. Finally, if the Secretary finds probable cause to believe a violation has occurred, he 'shall . . . bring a civil action against the labor organiza-

---

[14] The Secretary of Labor, who has primary responsibility for the enforcement of Title IV, has summarized the requirements of that Title in 29 CFR § 452.1 (1983). See generally 29 CFR pt. 452 (1983).

tion' in federal district court, to set aside the election if it has already been held, and to direct and supervise a new election." *Trbovich, supra,* at 531 (quoting §402, 29 U. S. C. §482). See *Calhoon, supra,* at 140. Significantly, the court may invalidate an election already held, and order the Secretary to supervise a new election, only if the violation of Title IV "may have affected the outcome" of the previous election. §402(c), 29 U. S. C. §482(c).

Congress also included in Title IV an exclusivity provision that explains the relationship between the enforcement procedures established for violations of Title IV and the remedies available for violations of potentially overlapping state and federal laws. In relevant part, §403 of the LMRDA provides:

> "Existing rights and remedies to enforce the constitution and bylaws of a labor organization with respect to elections prior to the conduct thereof shall not be affected by the provisions of this title. The remedy provided by this title for challenging an election already conducted shall be exclusive." 73 Stat. 534, 29 U. S. C. §483.

Relying on this provision, and on the comprehensive nature of the enforcement scheme established by §402, we have held that Title IV "sets up an exclusive method for protecting Title IV rights," and that Congress "decided not to permit individuals to block or delay union elections by filing federal-court suits for violations of Title IV." *Calhoon, supra,* at 140.[15]

### III

We have not previously determined exactly how the exclusivity of Title IV's remedial scheme for enforcing rights guaranteed by that Title might affect remedies available to enforce other rights, such as those protected by Title I. Nor

---

[15] An exception to this general rule is provided in §401(c) of the Act for enforcing a candidate's right to distribution of campaign literature and equal access to membership lists. 29 U. S. C. §481(c). See 379 U. S., at 140, n. 13.

has Congress provided any definitive answers in this area. This case requires, however, that we decide whether Title I remedies are available to aggrieved union members while a union election is being conducted.

## A

It is useful to begin by noting what the plain language of the Act clearly establishes about the relationship between the remedies provided under Title I and Title IV. First, the exclusivity provision included in § 403 of Title IV plainly bars Title I relief when an individual union member challenges the validity of an election that has already been completed.[16] Second, the full panoply of Title I rights is available to individual union members "prior to the conduct" of a union election. As with the plain language of most federal labor laws, however, this simplicity is more apparent than real. Indeed, by its own terms, the provision offers no obvious solution to what remedies are available during the course of a union election, the issue presented by this case.

Even if the plain meaning of the "already conducted" language of § 403 could be read not to preclude other remedies until the actual tabulation and certification of ballots have been completed, we would hesitate to find such an interpretation determinative. First, such an approach would ignore the limitation on judicial remedies that Congress included in Title I, which allows a district court to award only "appropriate" relief. Moreover, we have previously "cautioned against a literal reading" of the LMRDA. *Wirtz* v. *Glass Bottle Blowers Assn., supra,* at 468. Like much federal

---

[16] This does not necessarily mean that § 403 forecloses the availability of all postelection relief under Title I. The exclusivity provision of Title IV may not bar postelection relief for Title I claims or other actions that do not directly challenge the validity of an election already conducted. See, *e. g.,* *Ross* v. *International Brotherhood of Electrical Workers,* 513 F. 2d 840 (CA9 1975) (common-law tort claim); *Amalgamated Clothing Workers Rank and File Committee* v. *Amalgamated Clothing Workers of America, Philadelphia, Joint Board,* 473 F. 2d 1303 (CA3 1973) (Title I claim).

labor legislation, the statute was "the product of conflict and compromise between strongly held and opposed views, and its proper construction frequently requires consideration of its wording against the background of its legislative history and in the light of the general objectives Congress sought to achieve." *Ibid.* (citing *National Woodwork Mfrs. Assn.* v. *NLRB,* 386 U. S. 612, 619 (1967)). See *Sadlowski,* 457 U. S., at 111. Indeed, in many ways this admonition applies with its greatest force to the interaction between Title I and Title IV of the LMRDA, if only because of the unusual way in which the legislation was enacted.[17]

Nor does the legislative history of the LMRDA provide any definitive indication of how Congress intended § 403 to apply to Title I suits while an election is being conducted. Throughout the legislative debate on this provision, the exclusivity of Title IV was predominantly, if not only, considered in the context of a union election, such as one held at a union meeting, that would take place for a discrete and limited period of time.[18] Thus, Congress did not explicitly consider how the exclusivity provision might apply to an election that takes several weeks or months to complete. Moreover,

---

[17] The remarks of a commentator who actively participated in shaping much of the LMRDA are especially pertinent:

"The legislation contains more than its share of problems for judicial interpretation because much of the bill was written on the floor of the Senate or House of Representatives and because many sections contain calculated ambiguities or political compromises essential to secure a majority. Consequently, in resolving them the courts would be well advised to seek out the underlying rationale without placing great emphasis upon close construction of the words." Cox, Internal Affairs of Labor Unions Under the Labor Reform Act of 1959, 58 Mich. L. Rev. 819, 852 (1960).

See *Sadlowski,* 457 U. S., at 111; *Glass Bottle Blowers Assn.,* 389 U. S., at 468, n. 6.

[18] For example, speaking before Title I was added to the LMRDA, at which time state law provided the principal protection for union members before an election, Senator John F. Kennedy noted: "Prior to the day of an election an individual can sue in a State. The day after an election the Secretary of Labor assumes jurisdiction." 105 Cong. Rec. 6485 (1959).

the legislative history that is available on the meaning of § 403 is largely derived from congressional action that occurred prior to the time that Title I was added to the LMRDA. See, *e. g.,* S. Rep. No. 187, at 21; *id.,* at 104 (minority views); H. R. Rep. No. 741, 86th Cong., 1st Sess., 17 (1959). The interplay between the rights and remedies provided to union members by Title I, and the exclusivity provision already included in Title IV, therefore received little, if any, attention from the Congress. Cf. H. R. Conf. Rep. No. 1147, at 35 (Conference Report, written after both Titles were included in the Act, but failing to explain what remedies are available during an election).

## B

Despite this absence of conclusive evidence in the legislative history, the primary objectives that controlled congressional enactment of the LMRDA provide important guidance for our consideration of the availability of Title I remedies during a union election. In particular, throughout the congressional discussions preceding enactment of both Title I and Title IV, Congress clearly indicated its intent to consolidate challenges to union elections with the Secretary of Labor, and to have the Secretary supervise any new elections necessitated by violations of the Act. This strongly suggests that, even when Title I violations are properly alleged and proved, Congress would not have considered a court order requiring and judicially supervising a new election to be "appropriate" relief under Title I. At the same time, there is nothing in the legislative history suggesting that Congress intended to foreclose all access to federal courts under Title I during an election, especially when a statutory violation could be corrected without any major delay or disruption to an ongoing election. We therefore conclude that whether a Title I suit may properly be maintained by individual union members during the course of a union election depends upon the nature of the relief sought by the Title I claimants.

Throughout its consideration of the LMRDA, Congress clearly intended to lodge exclusive responsibility for post-election suits challenging the validity of a union election with the Secretary of Labor. The legislative history of Title IV consistently echoes this theme. For example, the election provisions contained in the Committee bill as originally reported to the full Senate gave the Secretary exclusive authority to enforce Title IV and to supervise whatever new elections might be needed because of violations of its provisions. S. 1555, 86th Cong., 1st Sess., §§ 302–303 (1959). As the Report of the Senate Committee on Labor and Public Welfare explained: "[S]ince the bill provides an effective and expeditious remedy for overthrowing an improperly held election and holding a new election, the Federal remedy is made the sole remedy and private litigation would be precluded." S. Rep. No. 187, at 21.[19] The bill that was finally passed by the Senate retained these procedures for violations of Title IV.

---

[19] A major reason for creating federal standards to govern union elections, and for lodging primary responsibility for enforcement of those standards with the Secretary of Labor, was the inadequacy of state-court remedies. Professor Archibald Cox, testifying before the Senate Subcommittee on Labor, explained in detail the inherent inability of courts to supervise elections:

"A court is also a clumsy instrument for supervising an election. The judicial process may be suitable for determining the validity of an election which has already been held; but if it is found invalid, or if no election has been held, judges have few facilities for providing an effective remedy. Merely to order an election might turn the authority to conduct the balloting over to the very same officers whose misconduct gave rise to the litigation. The court has no tellers, watchers, or similar officials. It would become mired in the details of the electoral process. To appoint a master to supervise the election would delegate the responsibility, but the master would face many of the same problems as the judge. Probably it is the consciousness of these weaknesses that has made judges so reluctant to interfere with union elections, though apparently a few court-conducted elections have been held." Labor-Management Reform Legislation: Hearings on S. 505 et al. before the Subcommittee on Labor of the Senate Committee on Labor and Public Welfare, 86th Cong., 1st Sess., 133–134 (1959) (hereinafter Hearings).

In the House, three separate bills were introduced, with all three containing substantially similar enforcement procedures for violations of Title IV. Unlike the Senate bill, the House bills permitted an aggrieved union member to file suit in federal district court to enforce his Title IV rights. See, *e. g.*, H. R. 8400, 86th Cong., 1st Sess., § 402 (1959) (Landrum-Griffin bill). Significantly, however, even these bills provided that the Secretary of Labor would supervise any new elections ordered by the court. See, *e. g.*, H. R. Rep. No. 741, *supra*, at 17 (if district court finds relevant statutory violation, the court should "declare the election, if any, to be void, and direct the conduct of a new election under the supervision of the Secretary of Labor"). Thus, even before the Conference Committee adopted the Title IV enforcement procedures included in the Senate bill, see H. R. Conf. Rep. No. 1147, at 35, both Houses of Congress had consistently indicated their intent to have the Secretary of Labor supervise any new union elections necessitated by the Act.[20]

Moreover, nothing in the flurry of activity that surrounded enactment of Title I, see *supra*, at 537–538, and n. 12, indicates that Congress intended that Title to reverse this consistent opposition to court supervision of union elections. Although the enactment of Title I offered additional protection to union members, including the establishment of various statutory safeguards effective during the course of a union election, there is no direct evidence to suggest that Congress believed that enforcement of Title I would either require or allow courts to pre-empt the expertise of the Secretary and

---

[20] This view is confirmed by the elaborate procedures eventually included in Title IV to ensure that the Secretary supervises any new elections and to minimize any other outside interference in union elections. See, *e. g.*, 29 U. S. C. § 482(a) (requiring exhaustion of internal remedies before member may file complaint with the Secretary; also providing that challenged elections shall be presumed valid pending final decision on Title IV violation); § 482(c) (requiring that any new elections be conducted under the Secretary's supervision).

supervise their own elections. In the absence of such legislative history, and given the clear congressional preference expressed in Title IV for supervision of new elections by the Secretary of Labor, we are compelled to conclude that Congress did not consider court supervision of union elections to be an "appropriate" remedy for a Title I suit filed during the course of a union election. § 102, 29 U. S. C. § 412.

That is not to say that a court has no jurisdiction over otherwise proper Title I claims that are filed during the course of a lengthy union election. The important congressional policies underlying enactment of Title I, see *supra*, at 536–537, likewise compel us to conclude that appropriate relief under Title I may be awarded by a court while an election is being conducted. Individual union members may properly allege violations of Title I that are easily remediable under that Title without substantially delaying or invalidating an ongoing election. For example, union members might claim that they did not receive election ballots distributed by the union because of their opposition to the incumbent officers running for reelection. Assuming that such union members prove a statutory violation under Title I, a court might appropriately order the union to forward ballots to the claimants before completion of the election. To foreclose a court from ordering such Title I remedies during an election would not only be inefficient, but would also frustrate the purposes that Congress sought to serve by including Title I in the LMRDA. Indeed, eliminating all Title I relief in this context might preclude aggrieved union members from ever obtaining relief for statutory violations, since the more drastic remedies under Title IV are ultimately dependent upon a showing that a violation "may have affected the outcome" of the election, § 402(c), 29 U. S. C. § 482(c).[21]

---

[21] Again, Professor Cox' testimony before the Senate Subcommittee on Labor suggested a similar analysis. Although he was speaking before Title I was added to the Senate bill, Professor Cox objected to a broad exclusivity provision, see S. 505, 86th Cong., 1st Sess., § 303 (1959) ("The

## C

Our conclusion that appropriate Title I relief during the course of a union election does not include the invalidation of

---

duties imposed and the rights and remedies provided by this title shall be exclusive"), that would have pre-empted all state law concerning union elections:

"[T]he provision exclude[s] suits in the State courts challenging the validity of union elections. An election is an integer. Its validity should be adjudicated once and for all in one forum. To permit State court actions would open the way to unnecessary harassment of the union on one side and to friendly suits aimed at foreclosing the Secretary's action on the other.

"I still believe that these purposes deserve to be accomplished but I have been persuaded that the language used in [S. 505] to accomplish them [is] much too broad. In a few States, actions have been successfully maintained in advance of a union election to compel the officers to comply with provisions of the constitution and bylaws such as putting a candidate's name on the ballot, permitting a classification of members to vote, or giving adequate notice of the elections. These remedies are often more effective than a challenge to the validity of an election after it has been held. They present the evil before it is accomplished. It is not impossible that other State courts will find it possible to give similar relief enforcing the union constitution and bylaws in advance of the election. Such proceedings would not interfere with the Federal policy because they do no more than compel the union officers to comply with the rules voluntarily adopted by the members.

"It may also become necessary for an individual member to resort to the courts to secure redress against his expulsion from the union or against other discipline imposed upon him because he dared to assert his rights in connection with an election. To enact that the provisions of the . . . bill should exclude all other rights and remedies might interfere with the bringing of such an action even though the Federal law gave no relief.

"I am not contending that [the exclusivity provision] would be held to exclude the last two forms of State intervention. I would hope that the Supreme Court would confine [the] section . . . to substantive State regulation and Federal or State actions challenging the validity of an election already conducted." Hearings, at 135.

In light of these suggestions, Professor Cox proposed amending the exclusivity provision so that it would not affect "the right of any member of a labor union to maintain an action to compel the observance of the constitution and bylaws of a labor organization in a forthcoming election of

an ongoing election or court supervision of a new election finds further support in our prior cases interpreting the LMRDA, and in the underlying policies of the Act that have controlled those decisions.    In *Calhoon* v. *Harvey*, 379 U. S. 134 (1964), for example, we were faced with a pre-election challenge to several union rules that controlled eligibility to run and nominate others for union office.    The claimants in that case asked the court to enjoin the union from preparing for or conducting any election until the rules were revised. We first concluded that in substance the claims alleged violations of Title IV rather than Title I, because the latter only protects union members against the discriminatory application of union rules.    Then, given that "Congress . . . decided not to permit individuals to block or delay union elections by filing federal-court suits for violations of Title IV," *id.*, at 140; see *supra*, at 540, we held that the District Court could not invoke its jurisdiction under Title I to hear Title IV claims.    We relied for our conclusion in part on Congress' intent "to allow unions great latitude in resolving their own internal controversies, and, where that fails, to utilize the agencies of Government most familiar with union problems to aid in bringing about a settlement through discussion before resort to the courts."    379 U. S., at 140.    See also *ibid.* ("It is apparent that Congress decided to utilize the special knowledge and discretion of the Secretary of Labor in order best to serve the public interest").

In several subsequent decisions, we also relied on the important role played by the Secretary in enforcing Title IV

---

officers, to challenge his expulsion or the imposition of other discipline, *or to assert any right of individual membership other than to challenge the validity of an election." Id.*, at 136 (emphasis added).    Although Professor Cox apparently assumed that union elections would occur during a discrete period of time, we believe that his analysis is consistent with the approach to Title I remedies available during a union election that we adopt today. Indeed, the broad exclusivity provision to which he was objecting was removed by the Senate Subcommittee and replaced with the language that now appears in § 403, 29 U. S. C. § 483.

violations and in supervising new union elections. See, *e. g.*, *Wirtz* v. *Glass Bottle Blowers Assn.*, 389 U. S., at 473–475; *Wirtz* v. *Laborers*, 389 U. S., at 482–484; *Wirtz* v. *Hotel Employees*, 391 U. S. 492 (1968). At the same time, we noted that another primary goal of Congress was to maximize the "'amount of independence and self-government'" granted to unions. See *Glass Bottle Blowers Assn.*, *supra*, at 472–473 (quoting S. Rep. No. 187, at 21); *Hodgson* v. *Steelworkers*, 403 U. S. 333 (1971). As we more fully explained in *Trbovich* v. *Mine Workers*, 404 U. S. 528 (1972), Congress made suit by the Secretary under Title IV the exclusive post-election remedy for challenges to an election "(1) to protect unions from frivolous litigation and unnecessary judicial interference with their elections, and (2) to centralize in a single proceeding such litigation as might be warranted with respect to a single election." *Id.*, at 532. Thus, exclusive postelection enforcement by the Secretary serves "as a device for eliminating frivolous complaints and consolidating meritorious ones." *Id.*, at 535.

Consistent with these policies, *Trbovich* cited *Calhoon*, *supra*, at 140, for the proposition that "§ 403 prohibits union members from initiating a private suit to set aside an election." 404 U. S., at 531. Although this somewhat overstated our holding in *Calhoon*, which was limited to the exclusivity of postelection suits by the Secretary for violations of Title IV, we believe that the policies supporting Congress' decision to consolidate Title IV suits with the Secretary are equally applicable to Title I suits that seek to "set aside an election."[22] Although the important protections

---

[22] Most recently, in *Dunlop* v. *Bachowski*, 421 U. S. 560 (1975), we held that a decision by the Secretary not to pursue court action under Title IV is subject to limited review in the district court. At the same time, we reaffirmed the Secretary's exclusive authority to challenge and, if successful, to supervise union elections. *Id.*, at 568–571.

We also note that, in a paragraph summarizing remedies under the LMRDA, our opinion in *Bachowski* briefly touched upon the interplay between the enforcement provisions under Title I and Title IV: "Certain

provided to union members by Title I should not easily be precluded, the equally strong policies vesting the Secretary with exclusive supervisory authority over new union elections require that Title I remedies during the course of an election be limited to this extent.

In sum, whether suits alleging violations of Title I of the LMRDA may properly be maintained during the course of a union election depends upon the appropriateness of the remedy required to eliminate the claimed statutory violation. If the remedy sought is invalidation of the election already being conducted with court supervision of a new election, then union members must utilize the remedies provided by Title IV. For less intrusive remedies sought during an election, however, a district court retains authority to order appropriate relief under Title I.

## IV

The procedural history of this case clearly demonstrates the undesirable consequences that follow from judicial supervision of a union election. The respondents filed suit after Local 82 had distributed election ballots to its members, but before some of the ballots had been returned or any of the ballots had been counted. Then, less than 24 hours before the election would have been completed and the ballots tabulated, the District Court issued a temporary restraining order that brought the election to a halt. This was followed by several months of negotiations between the parties and hearings before the District Court. Finally, the court issued

---

LMRDA provisions concerning pre-election conduct, 29 U. S. C. §§ 411–413 and 481(c), are enforceable in suits brought by individual union members. *Provisions concerning the conduct of the election itself, however, may be enforced only according to the post-election procedures specified in 29 U. S. C. § 482.* Section 483 is thus not a prohibition against judicial review but simply underscores the exclusivity of the § 482 procedures in post-election cases." *Id.*, at 566–567 (emphasis added). To the extent that our decision today holds that district courts may award certain Title I relief during the course of a union election, that holding prevails over any inconsistency with the italicized sentence.

an order declaring the interrupted election invalid, and setting forth elaborate procedures to be followed during a new election.

Several aspects of these proceedings demonstrate why they are inconsistent with the policies underlying the LMRDA. For example, the temporary restraining order and preliminary injunction issued by the court delayed the union election that was originally scheduled for December 1980 for one full year. Among other consequences, this left the incumbent union officers in power beyond the scheduled expiration of their terms. Cf. § 401(b), 29 U. S. C. § 481(b) (officers shall be elected not less than once every three years). If the procedures under Title IV had been properly followed, the December 1980 election would have been presumed valid, see § 402(a), 29 U. S. C. § 482(a), and new officers would have replaced the incumbents. Moreover, the expertise of the Secretary in supervising elections was completely ignored. Not only did the court acting alone decide that a new election was required, but its order established procedures for that election and appointed outside arbitrators to supervise their implementation. This action by the District Court directly interfered with the Secretary's exclusive responsibilities for supervising new elections, and was inconsistent with the basic objectives of the LMRDA enforcement scheme.

V

We conclude that the District Court overstepped the bounds of "appropriate" relief under Title I of the LMRDA when it enjoined an ongoing union election and ordered that a new election be held pursuant to court-ordered procedures. Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.[23]

*It is so ordered.*

---

[23] On remand, the preliminary injunction issued by the District Court should be vacated, and the ballots from the December 1980 election that

JUSTICE STEVENS, dissenting.

In the course of an election, Local 82 violated a number of the rights of respondent union members secured by Title I of the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), 73 Stat. 522, 29 U. S. C. § 401 *et seq.* Specifically, Local 82 restricted respondents' ability to nominate candidates of their choice for union office in violation of § 101(a)(1) of the Act, 29 U. S. C. § 411(a)(1), and prevented respondents from freely expressing their views at a union nominations meeting in violation of § 101(a)(2) of the Act, 29 U. S. C. § 411(a)(2). After the suit was filed, the union indicated that it was willing to rerun the election which had been conducted subsequent to the tainted nominations meeting. The District Court preliminarily enjoined the union to do exactly that, exercising its authority under § 102 of the Act, which provides in pertinent part: "Any person whose rights secured by the provisions of this subchapter have been infringed by any violation of this subchapter may bring a civil action in a district court of the United States *for such relief (including injunctions) as may be appropriate.*" 29 U. S. C. § 412 (emphasis supplied).

Today the Court agrees that respondents have established violations of Title I, and that the District Court had jurisdiction to fashion a remedy under § 102. However, the Court reverses the issuance of the preliminary injunction, holding that it did not constitute "appropriate relief" within the meaning of § 102. The Court so holds not because of anything in § 102 or its legislative history, but rather because of a provision in Title IV of the Act which was written long before § 102 was added to the LMRDA, and which was designed to

---

were sealed and delivered to the court should be returned to the custody of the petitioners. After those ballots have been counted, and the election completed, the respondents will have access to the remedies available under Title IV. We note that the Solicitor General has represented to this Court that "the Secretary would himself have sought a new election for a nominations violation like the one alleged here." Brief for Federal Respondent 11; Tr. of Oral Arg. 27.

limit the remedies available in state courts, rather than the remedy a federal court may provide for a violation of Title I.

It must be conceded that there is an inconsistency between Titles I and IV of the LMRDA. While § 102 in Title I grants district courts seemingly unqualified power to grant "such relief (including injunctions), as may be appropriate," § 403 of Title IV provides: "The remedy provided by this title for challenging an election already conducted shall be exclusive." 73 Stat. 534, 29 U. S. C. § 483. As the Court points out, the legislative history contains nothing that directly addresses this apparent inconsistency. *Ante*, at 542–543. I agree with the Court that the question presented by this case can be answered only by reference to the underlying purposes of the Act. *Ante*, at 541–542. However, I do not agree that those purposes support today's holding.

Title I was "aimed at enlarged protection for members of unions paralleling certain rights guaranteed by the Federal Constitution," *Finnegan* v. *Leu*, 456 U. S. 431, 435 (1982). By securing these rights, Congress hoped to ensure unions would function in a more democratic manner.[1] We have previously construed § 102 of Title I to have a broad sweep, consistent with its broad remedial purposes. In *Hall* v. *Cole*, 412 U. S. 1 (1973), we wrote: "§ 102 was intended to afford the courts 'a wide latitude to grant relief according to the necessities of the case,' and 'to give such relief as [the court] deems equitable under all the circumstances.'" *Id.*, at 13 (footnotes omitted) (quoting 105 Cong. Rec. 15548 (1959) (remarks of Rep. Elliott), and *id.*, at 6717 (remarks of Sen. Kuchel)). Employing this broad construction of the power conferred by § 102, we then held that an award of attorney's fees was consistent with the statute.[2]

---

[1] See *Steelworkers* v. *Sadlowski*, 457 U. S. 102, 112 (1982); *Finnegan*, 456 U. S., at 435–436; *Hall* v. *Cole*, 412 U. S. 1, 7–8 (1973); *Wirtz* v. *Hotel Employees*, 391 U. S. 492, 497–498 (1968).

[2] "[Section] 102 of the LMRDA broadly authorizes the courts to grant 'such relief (including injunctions) as may be appropriate.' 29 U. S. C. § 412. Thus, § 102 does not 'meticulously detail the remedies available to a

The Court concedes that § 102 authorizes the issuance of limited injunctions that would not substantially delay or invalidate an election, *ante*, at 546. The anomaly that results is that only the most serious violations of Title I go unremedied as a result of today's holding. It is only when a violation takes place in the midst of an election, produces the kind of irreparable injury that only an injunction can remedy, and is of a magnitude such that it taints the entire election and the results thereof, that the Court's holding precludes a remedy. Such an approach is plainly inconsistent with the fundamental purposes of Title I.

There is no instance in which Title I rights are of greater importance, and hence the need for their effective vindication a more compelling necessity, than in the midst of an election. We wrote in *Hall* that "Title I of the LMRDA was specifically designed to protect the union member's right to seek higher office within the union." 412 U. S., at 14. The reason for this is clear enough:

> "Congress adopted the freedom of speech and assembly provision in order to promote union democracy. It recognized that democracy would be assured only if union members are free to discuss union policies and criticize the leadership without fear of reprisal. Congress also recognized that this freedom is particularly critical, and deserves vigorous protection, in the context of [union] election campaigns. For it is in elections that members can wield their power, and directly express their approval or disapproval of the union leadership." *Steelworkers* v. *Sadlowski*, 457 U. S. 102, 112 (1982) (citations omitted).

By ensuring that Title I violations which go to the heart of the electoral process will not be effectively remedied, the majority seriously undermines the core purpose of Title I.

---

plaintiff,' and we cannot fairly infer from the language . . . an intent to deny to the courts the traditional equitable power to grant counsel fees in 'appropriate' situations." 412 U. S., at 10.

The underlying purposes of § 403, in contrast, provide no justification for limiting the relief available under § 102. Section 403 was written before Title I was added to the LMRDA on the floor of the Senate. Thus, as the majority acknowledges *ante*, at 542–543, there is little in Title IV's history or purpose to suggest that it was directed at limiting the relief available under Title I. At the time § 403 was drafted and discussed, its only effect was to limit the ability of *state* courts to invalidate union elections; that is certainly the only purpose or policy identified in the legislative history. For example, the Senate Report states:

> "Section [4]03 of the bill specifically preserves rights and remedies which union members have under existing law to insure compliance with provisions of a union's constitution and bylaws relating to elections prior to the conduct of an election. However, since the bill provides an effective and expeditious remedy for overthrowing an improperly held election and holding a new election, the Federal remedy is made the sole remedy and private litigation would be precluded." S. Rep. No. 187, 86th Cong., 1st Sess., 21 (1959).[3]

---

[3] The other relevant statements in the legislative history concerning § 403 also focus on its pre-emptive effect with respect to state courts, see 105 Cong. Rec. 14274 (analysis of the U. S. Chamber of Commerce); *id.*, at 7632 (remarks of Sen. Goldwater); S. Rep. No. 187, 86th Cong., 1st Sess., 101 (1959) (minority views); S. Rep. No. 1684, 85th Cong., 2d Sess., 12–15 (1958) (report on predecessor version of the LMRDA). The majority concludes that § 403 represents a congressional recognition that judicial intervention through suits brought by private litigants is an inappropriate way to remedy unfair elections, but the only legislative history cited by the majority in support of that conclusion is the testimony of Professor Cox, and even he refers only to pre-emption of suits in state courts. See *ante*, at 546–548, n. 21. See also *ante*, at 542, n. 19. The version of the LMRDA passed by the House provides little support for the Court's position that Congress was opposed to private suits to overturn union elections, since not only did the House version contain a Title I which was enforced by private suits, but also under that version Title IV itself was enforced by private suits which could result in the overturning of an election. See

In fact, this Court has previously acknowledged this very point: "The debates reflect great concern with the proper relationship between state and federal remedies, and much less concern with the relationship between private and public enforcement." *Trbovich* v. *Mine Workers*, 404 U. S. 528, 534, n. 6 (1972). Thus, the policies underlying § 403 are a slender reed on which to support today's holding.

Moreover, what limited relevance the original intent and purpose of Title IV has is undermined by the subsequent addition of Title I on the floor of the Senate. The precise reason Title I was added to the LMRDA was because Congress concluded that Title IV did not go far enough in protecting the rights of individual union members.[4] In particular, Congress added § 102 because it felt that these rights had to be enforced through a private right of action. *Finnegan*, 456 U. S., at 440, n. 10.

The original version of Title I, offered as an amendment to the LMRDA by Senator McClellan, provided that the rights contained therein would be enforced through suits brought by the Secretary of Labor. See 105 Cong. Rec. 6469–6492 (1959). The amendment passed only narrowly, with the Vice President casting the tie-breaking vote. See *id.*, at 6493. One of the arguments made against this version of Title I by a number of Senators was that the rights it created were indi-

---

H. R. 8342, §§ 101–102, 402, 86th Cong., 1st Sess. (1959), reprinted in 105 Cong. Rec. 15884, 15887 (1959). See also H. R. Rep. No. 741, 86th Cong., 1st Sess., 16–17 (1959) ("A member of a labor organization who is aggrieved by any violation of these provisions . . . may bring a civil action against such labor organization in the U. S. district court for the district in which the principal office of such labor organization is located. Such action may be for the purpose of preventing and restraining such violation and for such other relief as may be appropriate, including the holding of a new election under the supervision of the Secretary of Labor and in accordance with this title").

[4] See *Sadlowski*, 457 U. S., at 109; 105 Cong. Rec. 6470–6474 (1959) (remarks of Sen. McClellan); *id.*, at 6476–6478; *id.*, at 6488 (remarks of Sens. Allott and Goldwater); *id.*, at 6490 (remarks of Sen. Dirksen).

vidual in nature and should be enforced through a private right of action rather than by the Secretary of Labor.[5]

Three days later, Senator Kuchel offered a compromise version of Title I. He explained:

> "[I]n several major points the McClellan amendment would be changed by our amendment. In one case our amendment provides for deleting from the McClellan amendment the provision for the right of the Secretary of Labor to seek an injunction when any of the rights enumerated are alleged to have been violated. In such circumstances, our amendment gives a union member who alleges such a grievance the right to go into the Federal court for appropriate relief." *Id.*, at 6717.

This change resulted from dissatisfaction with leaving Title I rights in the hands of the Secretary of Labor. Senator Kuchel explained:

> "[H]ere is one of the major changes in the proposal. The amendment of the Senator from Arkansas provided that the Secretary of Labor might, on behalf of the injured or aggrieved member, have the right to litigate the alleged grievance and to seek an injunction or other relief. We believe that giving this type of right to the aggrieved employee member himself is in the interest of justice, and therefore we propose to eliminate from the bill the right of the Secretary of Labor to sue in his behalf." *Id.*, at 6720.

Senator Kefauver congratulated Senator Kuchel on removing the Secretary of Labor from "the middle of the actions of every labor union in the United States," *id.*, at 6726, and Senator Clark noted that the new version of Title I "takes the Federal bureaucracy out of this bill of rights and leaves

---

[5] See *id.*, at 6696 (remarks of Sen. Johnston); *id.*, at 6486 (remarks of Sen. Kennedy); *id.*, at 6485 (remarks of Sen. Morse); *id.*, at 6483 (remarks of Sen. Kennedy).

its enforcement to union members, aided by courts," *id.*, at 6721. Senator Curtis said that according the individual union member a private right of action "represents the finest means by which his rights may be protected." *Id.*, at 6723. There are numerous other statements in the legislative history to similar effect.[6] Thus, whatever may have been its belief when Title IV was originally drafted, the legislative history of Title I demonstrates that Congress rejected reliance on the Secretary of Labor to vindicate Title I rights. Yet that is the precise effect of today's holding—in those cases where the seriousness of the violation and the irreparability of the remedy would justify an injunction overturning the results of an election, the Court has decreed that union members' ability to obtain a remedy for violations of their Title I rights is left to the discretion of the Secretary, a result at odds with the fundamental reason § 102 was added to the statute.[7]

*Calhoon* v. *Harvey*, 379 U. S. 134 (1964), the case on which the majority principally relies, does not require the Court to adopt its parsimonious construction of § 102. In *Calhoon*, the Court began its analysis with a simple proposition: "Jurisdiction of the District Court under § 102 of Title I depends entirely upon whether this complaint showed a violation of rights guaranteed by § 101(a)(1)," *id.*, at 138. In stating its

---

[6] See *id.*, at 15836 (remarks of Rep. McCormack); *id.*, at 15689 (remarks of Rep. O'Hara); *id.*, at 15670–15671 (remarks of Rep. Loser); *id.*, at 15564–15565 (analysis of Rep. Foley); *id.*, at 14989 (remarks of Sen. Morse); *id.*, at 14345 (remarks of Rep. Landrum); *id.*, at 10902–10903 (remarks of Sen. McClellan); *id.*, at 7023 (section-by-section analysis).

[7] See generally *Calhoon* v. *Harvey*, 379 U. S. 134, 144–145 (1964) (Stewart, J., concurring). As I have previously observed, this result leaves the individual union member's statutory rights subject to the Secretary of Labor's willingness to proceed against what may be an entrenched and politically powerful union leadership. See *Hodgson* v. *Lodge 851, International Assn. of Machinists & Aerospace Workers, AFL–CIO*, 454 F. 2d 545, 564 (CA7 1971) (dissenting opinion).

holding, the Court never mentioned §403, much less hold
that it limited the scope of relief available under §102. The
Court simply held that the complaint in that case did not fall
under §102 because it challenged the eligibility requirements
for union office, and "Title IV, not Title I, sets standards for
eligibility and qualifications of candidates and officials," *ibid.*
In this case, since the Court concedes that respondents
established the probable existence of violations of §101, it
follows that under *Calhoon* there is jurisdiction to issue an
"appropriate" remedy for those violations.[8]

In sum, the Court's conclusion that §403 is a limitation on
the power granted district courts in §102 turns the statute
and its legislative history on their head. The majority reads
the statute as if Title IV had been added to the statute to
limit the scope of Title I, when in reality the reverse is true.
Congress wanted union members to be able to protect their
own Title I rights rather than to rely on the Secretary of
Labor. Because the Court's holding means that the most
serious violations of Title I cannot be adequately remedied
except in the discretion of the Secretary, I cannot join the
Court's holding or judgment.

I recognize that in practice the question whether a new
election is an appropriate remedy will not be free from diffi-
culty. In shaping a remedy, the exercise of the district
court's discretion should be informed by the national labor
policies discussed by the Court *ante*, at 544, n. 19, 548–549:

---

[8] The majority itself explains why two of our other cases are not control-
ling. Statements in *Dunlop* v. *Bachowski*, 421 U. S. 560, 566–567 (1975),
concerning the pre-emptive effect of §403 are correctly characterized by
the majority as dicta which the majority itself repudiates as too broad.
*Ante*, at 549–550, n. 22. Similarly, the Court recognizes that *Trbovich*'s
citation of *Calhoon* as standing for the proposition that "§403 prohibits
union members from initiating a private suit to set aside an election," 404
U. S., at 531, was an overstatement of the holding of *Calhoon*. *Ante*, at
549. Moreover, *Trbovich*, like *Calhoon* and *Bachowski*, involved claims
properly brought under Title IV; no issue concerning the scope of §102 was
presented.

courts should be wary of unjustified or excessive interference in union elections and of the difficulties inherent in supervising an election; they should also accord due deference to the views of the Secretary of Labor.[9]  However, it is unnecessary to confront any question concerning the meaning of "appropriate" relief in this case, for two reasons.  First, petitioners themselves do not press the point.  The questions presented in their petition for certiorari, and the thrust of their briefs, are that § 403 precluded the District Court from acting as it did.  Petitioners do not argue that the District Court abused its discretion even if § 403 were not applicable here.  Second, in large part petitioners stipulated to the appropriateness of the relief in the District Court, by filing stipulations indicating that they were willing to rerun the allegedly tainted election.  See 521 F. Supp. 614, 618, 623 (Mass. 1981); App. 55–60, 108–110.  I agree with the Court of Appeals that since the relief the District Court ultimately issued was substantially similar to what petitioners had indicated they were willing to do anyway, Judge Keeton did not abuse his discretion in fashioning a remedy.  See 679 F. 2d 978, 996–999 (CA1 1982).

Accordingly, I do not believe that the District Court failed to fashion "appropriate" relief or otherwise abused its discretion.  I respectfully dissent.

---

[9] Under Federal Rule of Civil Procedure 24(b), the Secretary of Labor can intervene in Title I litigation, as he has in this case.  Cf. *Trbovich*, 404 U. S., at 536–539 (union members may intervene in Title IV actions brought by the Secretary).