Opinion by Judge PAEZ; Concurrence by Judge BYBEE.
OPINION
PAEZ, Circuit Judge:
Plaintiff Alex Corns, a now-retired member of Defendant Hod Carriers Local Union No. 166 (“Local 166”), filed this lawsuit under § 101(a)(3) of the Labor-Management Reporting and Disclosure Act (“LMRDA”), 29 U.S.C. § 411(a)(3), to challenge the legality of an organizing fee and a dues increase imposed on Local 166 members by the local union’s umbrella labor organizations. Corns alleges that the labor organizations could not extract these fees without the approval of the Local 166 membership by a secret ballot vote, as provided in § 101(a)(3)(A). We hold that the plain text of the LMRDA authorizes a labor organization, other than a local labor organization or a federation of national or international labor organizations, to levy assessments or increase dues or initiation fees payable by its members by any of the procedures enumerated in § 101(a)(3)(B), provided that union members’ rights are adequately protected in the approval process.
Because Defendant Laborers International Union of North America (“LIUNA”) satisfied both prerequisites in this case, we conclude that it complied with the LMRDA when it enacted an organizing fee, applicable to all of its members working in the construction industry, following a majority vote of its delegates at a general convention. With respect to the dues increase approved by Defendant Northern California District Council of Laborers (“NCDCL”), however, we conclude that the NCDCL lacked the statutory authority to ratify such an increase because Local 166 members are not, by the express terms of the International Union and Uniform District Council constitutions, members of the NCDCL. Accordingly, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.
I. BACKGROUND
LIUNA is an international labor union that represents employees in the construction industry. The NCDCL functions as an intermediate body between LIUNA and fifteen Northern California local unions af *904 filiated with LIUNA. Local 166, one of the local unions within the NCDCL’s jurisdiction, represents masonry and plastering employees in Alameda, Contra Costa, San Francisco, and San Mateo counties.
A. The Union Hierarchy
We begin by describing the union hierarchy because our determination of the legality of the actions undertaken by LIUNA, the NCDCL, and Local 166 (collectively, “the Unions”) requires an understanding of not only the Unions’ organizational structure, but also the source and scope of their respective powers and obligations. LIUNA, which consists of the members of its affiliated local unions, derives its authority from the International Union Constitution. Int’l Union Const, art. I, § l.[1] LIUNA’s primary purpose is to protect and advance the welfare of its members by engaging in collective bargaining with employers; improving members’ employment benefits and working conditions; implementing programs, practices, and policies to enhance members’ employment opportunities; and participating in legal and legislative activities that serve to benefit the union membership. Id. art. II, § 1. To that end, it is empowered to issue charters to subordinate bodies, including district councils and local unions; establish policies for and on behalf of itself and its subordinate bodies and members; and govern, discipline, and regulate its subordinate bodies. Id. art. II, § 2. Because LIUNA is the umbrella labor organization, all of its affiliated district councils and local unions are bound by its actions, and are obligated to comply with the Unions’ respective constitutions, including the International Union Constitution, the Uniform District Council Constitution, and the Uniform Local Union Constitution. Id. art. XVII, § 4.
The NCDCL, a subordinate body created by LIUNA through a district council charter, “is charged with the responsibility to unif^ all of the economic and other forces of the affiliated Local Unions in its area, as a central representative body of such Local Unions.” Unif. Dist. Council Const, art. II, § 1. Fifteen local unions in Northern California are affiliated with the NCDCL. As provided in Article XIX, § 5 of the International Union Constitution and Article I, § 2 and Article IV, § 1 of the Uniform District Council Constitution, the NCDCL’s membership consists of delegates from its affiliated local unions.[2] To effectuate its purpose, the NCDCL possesses the constitutional authority “[t]o negotiate, bargain for and enter into understandings and agreements with employers, for and [on] behalf of its affiliated Local Unions and to enforce and police the ob *905 servance thereof by employees and employers, Local Unions and their members .... ” Unif. Dist. Council Const, art. II, § 2(d). The Uniform District Council Constitution also empowers the NCDCL to establish and regulate the amount of dues and initiation fees paid by members of its affiliated local unions. Id. art. II, § 2(e). To increase dues or fees, the NCDCL must convene a special convention at which delegates vote on whether an increase is necessary for one or more of the fifteen local unions. Id. art. VIII, § 2.
Local 166, an affiliate of LIUNA and the NCDCL, exists for the purpose of “gathering under one banner all those that work at the craft and calling of said International Union, in accordance with the craft and territorial jurisdiction allotted to each Local Union by its charter.” Unif. Local Union Const, art. I, § 1. Pursuant to the Uniform Local Union Constitution, Local 166 is authorized to establish rules, policies, and practices; collectively bargain with employers; and provide for the well-being and security of its members, officers, and employees through the establishment of insurance, health, and welfare benefit plans. Id. art. II, § 2. Local 166 is also empowered to raise income from dues, fees, and assessments payable by its members. Id. art. II, § 2(b). Like the Uniform District Council Constitution, the Uniform Local Union Constitution provides that dues and initiation fees shall be established and regulated by the NCDCL. Id. art. VIII, § 1. If, however, dues and initiation fees are not established by the district council, Local 166 is authorized to impose them by a secret ballot vote of the membership. Id. art. VIII, § 2.
B. Local 166 Members’ Dues and Fees Structure
Local 166 members’ dues and fees are dictated by multiple collective bargaining agreements, some of which were negotiated by the NCDCL pursuant to its constitutional authority. When members work within San Francisco, San Mateo, Contra Costa, and Alameda counties, they work under collective bargaining agreements negotiated by their local union or the NCDCL (“the Local 166 Agreements”), or under collective bargaining agreements negotiated by Hod Carriers Local Union No. 36 (“Local 36”).[3] Otherwise, they may work under collective bargaining agreements negotiated by the NCDCL on behalf of multiple local unions in various Northern California counties.
Local 166 members’ wages and dues rates vary depending on the applicable collective bargaining agreement. Generally, however, members pay union dues consisting of regular dues (sometimes referred to as “counter dues”) in a fixed monthly amount; working dues (sometimes referred to as “dues check-off’ or “supplemental dues”) in an amount that corresponds with the hours each member works; and organizing fees in an amount that varies depending on the location of the work and the governing collective bargaining agreement. Individual employers withhold these dues and fees from Local 166 members’ wages and, depending on the agreement, the deductions are remitted to either Local 166’s Trust Funds or the NCDCL’s Trust Fund.
C. LIUNA Organizing Fee
Corns challenges the organizing fee approved at LIUNA’s 2006 general conven *906 tion. During the convention, LIUNA’s delegates ratified Resolution 12, which required, among other things, that every affiliated local union involved in the construction industry pay $0.25 per hour, to be phased in over the ensuing three years, to a regional organizing fund for all hours worked by its members in construction. The regional organizing funds were intended to finance activities designed to increase LIUNA’s membership.
In accordance with Resolution 12, the LIUNA organizing fee was incorporated into some of the collective bargaining agreements covering Local 166 members. Thus, although Local 166 members had not previously incurred an organizing fee for work performed in San Francisco and San Mateo counties, the 2008-10 San Francisco and San Mateo Masonry Agreement included an organizing fee of $0.16 per hour and the 2008-10 San Francisco and San Mateo Plastering Agreement included an organizing fee of $0.25 per hour.
Under three separate collective bargaining agreements covering work performed in Alameda and Contra Costa counties, Local 166 members paid separate fees used to fund Local 166 organizing efforts. Specifically, under the 2005-07 Alameda and Contra Costa Masonry Agreements, members paid an organizing fee of $0.60 per hour for work performed under these agreements. Meanwhile, the ' 2005-07 Alameda and Contra Costa Plastering Agreement provided for an organizing fee of $1.10 per hour for work performed under this agreement. The organizing fees were carried over into the renegotiated 2008-10 Alameda and Contra Costa Plastering and Masonry Agreements.
D. The NCDCL Dues Increase
Corns also challenges dues increases included in the 2008-10 Local 166 Agreements, which included the San Francisco and San Mateo Masonry Agreement, the San Francisco and San Mateo Plastering Agreement, the Alameda and Contra Cos-ta Masonry Agreement, the Alameda and Contra Costa Commercial Plastering Agreement, and the Alameda and Contra Costa Residential Plastering Agreement. At a general meeting held on June 20, 2008, the NCDCL approved the 2008-10 Agreements, all of which included wage and dues increases. The agreements went into effect on July 1,2008.
After receiving notice of the increases, Corns wrote LIUNA’s general president to express his concern about the imposition of a dues increase absent a secret ballot vote of the local membership. The following day, the NCDCL’s executive board proposed that a special convention be held on September 19, 2008 to consider the dues increase included in the 2008-10 Local 166 Agreements. The proposal was presented to and approved by the NCDCL’s general delegates at a meeting held on that same date.
Although the 2008-10 Local 166 Agreements had already been ratified by the NCDCL, the agreements were presented to Local’ 166 members at a general board meeting on June 26, 2008. Corns objected, requesting that a standing vote count of the membership be taken to approve the new agreements. A majority of Local 166 members voted in favor of the 2008-10 Local 166 Agreements by a standing vote.[4]
*907 On August 8, 2008, the NCDCL provided notice of the special convention to its delegates. At the special convention held on September 19, 2008, the NCDCL’s delegates, including two Local 166 representatives, voted unanimously to approve the dues increase included in the 2008-10 Local 166 Agreements.
Corns wrote a letter to LIUNA objecting to the increases approved at the NCDCL special convention. LIUNA’s general president responded to Corns on March 13, 2009, explaining that LIUNA took the position that Local 166’s dues were properly increased in accordance with the Uniform District Council and Uniform Local Union constitutions.
E. Procedural Background
Corns then filed this lawsuit, seeking damages for the increased dues and organizing fees deducted from his wages as a member of Local 166, a declaration prohibiting the NCDCL from exercising its power to impose dues increases in accordance with the Uniform District Council and Uniform Local Union constitutions, and injunctive relief. The parties filed cross-motions for summary judgment. In denying Corns’s motion for partial summary judgment and granting the Unions’ motion, the district court concluded that § 101(a)(3) of the LMRDA provides alternative methods for levying assessments and increasing dues, and requires a secret ballot vote of the local membership only when a local labor organization imposes an assessment or dues increase. Because LI-UNA and the NCDCL are not local labor organizations, the district court concluded that they validly approved the organizing fee and the dues increase following a majority vote of their delegates at a regular convention and a special convention, respectively, in accordance with § 101(a)(3)(B)(i).
II. STANDARD OF REVIEW
We review de novo a district court’s grant of summary judgment. Walls v. Cent. Contra Costa Transit Auth., 653 F.3d 963, 966 (9th Cir.2011). Summary judgment is appropriate when, viewing the evidence in the light most favorable to the non-moving party, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Id. We draw all reasonable inferences in the light most favorable to the moving party, but “[cjonclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment.” Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir.2007).
III. DISCUSSION
The LMRDA “was the product of congressional concern with widespread abuses of power by union membership.” Finnegan v. Leu, 456 U.S. 431, 435, 102 S.Ct. 1867, 72 L.Ed.2d 239 (1982). Although the initial “legislation focused on disclosure requirements and the regulation of union trusteeships and elections,” Congress subsequently adopted numerous amendments “all aimed at enlarged protection for members of unions paralleling certain rights guaranteed by the Federal Constitution.” Id. The amendments created a statutory “Bill of Rights” “specifically designed to promote the ‘full and active participation by the rank and file in the affairs of the union.’” Hall v. Cole, 412 *908 U.S. 1, 7-8, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973) (quoting Am. Fed’n of Musicians v. Wittstein, 379 U.S. 171, 182-83, 85 S.Ct. 300, 13 L.Ed.2d 214 (1964)). Title I of the LMRDA, which reflects the amendments, granted a panoply of rights to union members, including the right to vote and participate in a union’s decision-making process, freedom of speech and assembly, and procedural safeguards in disciplinary actions.[5] 29 U.S.C. § 411(a); see also Local 82, Furniture & Piano Moving v. Crowleg, 467 U.S. 526, 536-37, 104 S.Ct. 2557, 81 L.Ed.2d 457 (1984). “In providing such protection, Congress sought to further the basic objective of the LMRDA: ‘ensuring that unions [are] democratically governed and responsive to the will of their memberships.’ ” Sheet Metal Workers’ Int’l Ass’n v. Lynn, 488 U.S. 347, 352, 109 S.Ct. 639, 102 L.Ed.2d 700 (1989) (quoting Finnegan, 456 U.S. at 436, 102 S.Ct. 1867 (alteration in original)).
A. Section 101(a)(3) of the LMRDA
The issues raised here primarily concern § 101(a)(3), a rarely invoked provision of Title I of the LMRDA, governing the imposition of dues, initiation fees, and assessments by labor organizations.[6] We have previously recognized that the purpose of § 101(a)(3) “is to curb the potential for autocratic and unrepresentative rule of union officers by preventing the leadership of a union from imposing arbitrary financial extractions unilaterally on its membership.” Burroughs v. Operating Eng’rs Local Union No. 3, 686 F.2d 723, 728 (9th Cir.1982) (internal citation omitted).
Because the parties dispute whether § 101(a)(3)(A) or (B) applies in this case, we must address the threshold issue of statutory construction. In interpreting the meaning of § 101(a)(3), we first consider the plain text of the statute. Washington v. Chimei Innolux Corp., 659 F.3d 842, 847 (9th Cir.2011). In doing so, “[w]e examine not only the specific provision at issue, but also the structure of the statute as a whole, including its object and policy.” Id. at 847-48 (quoting Children’s Hosp. & Health Ctr. v. Belshe, 188 F.3d 1090, 1096 (9th Cir.1999)).
As the introductory paragraph explains, § 101(a)(3) does not apply to a federation *909 of national or international labor organizations. 29 U.S.C. § 411(a)(3). All other labor organizations,[7] however, must abide by § 101(a)(3)’s requirements prior to increasing dues or initiation fees or levying assessments. In light of the provision’s parallel references to “members” in the clause regarding increases in rates of dues and initiation fees, on the one hand, and the clause regarding the levying of general or special assessments, on the other hand, we conclude that § 101(a)(3) mandates that a labor organization shall only impose such financial extractions on its own members, as that term is defined in the LMRDA.[8] Id.
Subsection (A) provides that when a local labor organization seeks to increase dues or initiation fees or levy assessments, it must first obtain the approval of the. majority of its members in good standing. Id. § 411(a)(3)(A). This approval always necessitates a secret ballot[9] vote of the local membership, at either a general or special membership meeting or in a membership referendum. Id. By requiring a secret ballot vote in both instances, § 101(a)(3) serves the dual purpose of protecting members’ right to participate in their local union’s decision-making processes while simultaneously ensuring that they will not be subjected to unjust discrimination on account of how they cast their ballot. See Finnegan, 456 U.S. at 435-36, 102 S.Ct. 1867 (explaining that the statutory “Bill of Rights” “placed emphasis on the rights of union members to freedom of expression without fear of sanctions by the union, which in many instances could mean loss of union membership and in turn loss of livelihood.”).
Subsection (B), meanwhile, applies to dues or initiation fees increases or assessments imposed on members of a labor organization, “other than a local labor organization or a federation of national or international labor organizations.” 29 U.S.C. § 411(a)(3)(B) (emphasis added). Under subsection (B), labor organizations, such as international unions, are authorized to increase dues or initiation fees or levy assessments by one of several methods, including by a majority vote of delegates at a regular or special convention. Id. This, too, comports with the objectives of the LMRDA, which we have concluded was not intended to infringe international unions’ traditional authority to establish local unions’ rates of dues. See Mori v. Int’l Bhd. of Boilermakers, Local 6, 653 F.2d 1279, 1283 (9th Cir.1981). In this *910 way, the LMRDA balances umbrella labor organizations’ interest in self-governance with union members’ right to participate in the decision-making process through elected representatives. Crowley, 467 U.S. at 589, 104 S.Ct. 2557 (noting that Congress meant to further the LMRDA’s basic policy of promoting democratic union governance “with a minimum of interference in the internal affairs of unions.”).
Reading these provisions together, and taking into account the LMRDA’s objectives and policy, we conclude that subsections (A) and (B) provide alternative methods for increasing dues or initiation fees or levying assessments. See Davis v. Mich. Dep’t of Treasury, 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989) (explaining that “[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.”). In particular, we note Congress’ use of the word “or” to separate the two subsections, which we interpret as taking its “ordinary, contemporary, common meaning.” Perrin v. United States, 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979). “In its elementary sense, the word ‘or,’ as used in a statute, is a disjunctive particle indicating that the various members of the sentence are to be taken separately.” 73 Am.Jur. 2d Statutes § 147 (2012).[10]
Although we conclude that the plain text of the LMRDA controls our analysis, we also find support for our interpretation in the existing case law. In Ranes v. Office Employees International Union, Local No. 28, for example, the plaintiffs argued that a local union could not increase dues in accordance with the international union’s constitutional amendment raising the minimum dues requirement without a secret ballot vote of the local membership. 317 F.2d 915, 916 (7th Cir.1963). The Seventh Circuit held that the international union complied with the LMRDA when it increased the constitutional minimum for dues payable by its members to their respective local unions following the approval of the increase by a majority of delegates voting at its regular convention. Id. at 916-17. The Seventh Circuit observed that, although a local union must obtain a majority vote of its members under subsection (A), “subsection (B) prescribes alternative methods by which an international union may increase ‘rates of dues.’ ” Id. at 917 (emphasis added). In so concluding, the court explained:
The legislative history of the Act is silent on this question, but we think it clear that [§ ] 101(a)(3) embodies congressional recognition of the existence of a sphere of interest in both international and local unions in the area of membership dues. Traditionally, international unions have exercised primary jurisdiction over affairs of their affiliated local unions, including the control of the local dues structure sufficient to insure the financial health of the union structure. Many international unions exercise control in the latter sphere of interest by the device of prescribing the minimum rate for the dues which each of their locals shall collect from its members. We cannot assume that Congress was unaware of the traditional structure and dues practices of labor unions when it enacted [§ ] 101(a)(3), or that Congress, being aware of the traditional structure and practices, intended by enacting that *911 Section to strip international unions of their traditional power to control the minima and maxima of rates of dues without one word in the Committee Reports expressing that intention. On the contrary, we must assume that Congress was aware of the established structure and practices and interpret the statute in the light thereof.
Id. at 917-18 (footnotes omitted). Recognizing that the purpose of § 101(a)(3) is to protect union members’ rights, the Seventh Circuit further concluded that members’ rights are adequately protected when they “have representation at the council table where dues structures are changed.” Id. at 918.
Relying in part on the reasoning in Ranes, we held that the LMRDA authorized an international union to increase the dues imposed on field construction members in its affiliated local unions by approving the dues structure by a majority of delegates voting at a convention of the international union. Mori, 653 F.2d at 1285. We found support for the Seventh Circuit’s approach in a subsequently decided Supreme Court case, in which the Court concluded that the LMRDA was not intended to disrupt the established union practice of weighted voting. Id. at 1283 (quoting Wittstein, 379 U.S. at 178, 85 S.Ct. 300). As a result, we adopted the Seventh Circuit’s interpretation of the LMRDA and endorsed “two considerations supportive of an international’s power to establish minimum local dues: legislative intent [to preserve international unions’ traditional authority to establish rates of dues] and adequate protection of union members’ rights.” Id.
With respect to the first consideration, we agreed that Congress did not intend to curb international unions’ traditional power to establish local unions’ rates of dues. Id. at 1284. Addressing the second consideration, we noted “the participation of delegates representing plaintiffs ensured their rights under [§ ] 101(a)(3)(B),” and concluded that “there [was] no reason in this case to distrust the democratic process at work at the convention.” Id. at 1285. Although the dues increase applied to only “a minority within the international,” id. at 1284, we concluded that the international union’s efforts did “not reflect an attempt on the part of a majority of the international to exploit or discriminate against the minority of construction workers,” id. at 1285. “Instead, the convention’s action appealed] to reflect the judgment of the majority concerning the measures necessary to enhance the vitality of the construction lodges.” Id. We also found it significant that the funds collected under the new dues structures would “be retained by the local construction lodges for their own benefit.” Id. at 1284.
In light of the plain text of the statute and the LMRDA’s purposes, we hold that § 101(a)(3)(A) and (B) establish alternative methods by which labor organizations are authorized to increase dues or initiation fees or to levy assessments on their members, subject to the explicit restrictions in the statute. In other words, the LMRDA requires that, prior to increasing dues or initiation fees or levying assessments, a local union must always obtain the majority approval of its members in good standing by a secret ballot vote. 29 U.S.C. § 411(a)(3)(A). The statute, however, concurrently permits any other labor organization, except for the excluded categories set forth in the provision, to impose an identical dues or fees increase or assessment by any of the methods provided in § 101(a)(3)(B), including by majority delegate approval at a general or special convention. Id. § 411(a)(3)(B); see also Mori, 653 F.2d at 1285 (permitting an international union to impose a dues increase *912 payable by local union members to then-respective local unions). And, as explained in Moñ, any exercise of authority under § 103(a)(3) must adequately protect members’ rights.[11] Id. By creating alternative methods, the LMRDA balances the twin goals of protecting union democracy and preserving union self-governance. See Marcia Greenblatt, Note, Union Officials and the labor Bill of Rights, 57 Fordham L.Rev. 601, 60102 (1989) (explaining that Congress “did not intend the LMRDA to prevent the unions from maintaining reasonable rules for self-governance, and therefore tempered the goal to democratize the unions with a policy to avoid excessive interference into intra-union government.” (footnote omitted)). Thus, having established the statutory framework within which this case must be analyzed, we turn to the particular financial extractions at issue.
B. The LIUNA Organizing Fee
Resolution 12, which was adopted by a majority of LIUNA’s delegates voting at a regular convention, provided, in relevant part, “that every Local Union having jurisdiction in the construction industry shall pay $.25 per hour, to be phased in over three years[.]” Corns argues that LIUNA violated § 101(a)(3)(A) of the LMRDA by approving Resolution 12 without a secret ballot vote of the local unions’ membership. We disagree.
Because LIUNA is an international union, its approval of Resolution 12 is governed by subsection (B), not subsection (A), of § 101(a)(3) of the LMRDA. As explained above, the LMRDA authorizes an international union to increase dues or initiation fees or levy an assessment payable by its members provided that it satisfies § 101(a)(3)(B)’s requirements and it adequately protects the rights of union members in the approval process. 29 U.S.C. § 411(a)(3)(B); see also Moñ, 653 F.2d at 1285. There is no dispute that, under Article I, § 1 of the International Union Constitution, the members of LIU-NA’s affiliated local unions are also members of the international union. Therefore, LIUNA is statutorily empowered to impose financial obligations on local union members. The international union also complied with the LMRDA by adopting Resolution 12 by one of the procedures explicitly authorized under § 101(a)(3)(B) — approval by a majority of LIUNA’s delegates voting at a regular convention. 29 U.S.C. § 411(a)(3)(B)(i). And, notably, Corns does not assert that any procedural irregularity occurred, or that union members’ rights were not adequately protected in the voting process. See Mori, 653 F.2d at 1284-85.
Although the organizing fees are not retained by local unions, as they were in Mori, the funds are used to increase union membership in the district councils’ regional jurisdictions. Such efforts directly benefit LIUNA’s affiliated local unions by adding new members to their ranks. Thus, we conclude that LIUNA satisfied the LMRDA’s requirements when it adopted the $0.25 per hour organizing fee *913 following the approval of Resolution 12 by a majority of its delegates voting at a general convention.
Corns further argues that even if the adoption of Resolution 12 did not contravene the LMRDA’s requirements, the implementation of the organizing fee was nonetheless deficient in several respects. First, Corns argues that the organizing fees included in the 2008-10 Local 166 Agreements exceeded the amount authorized by Resolution 12. The organizing fees added to the 2008-10 San Francisco and San Mateo Masonry and Plastering Agreements, $0.16 and $0.25 per hour, respectively, are plainly within the maximum rate authorized by Resolution 12. The organizing fees provided for in the 2008-10 Alameda and Contra Costa Masonry and Plastering Agreements, $0.60 and $1.10 per hour, respectively, similarly do not exceed the $0.25 per hour organizing fee approved by LIUNA because they represent independent financial obligations imposed by Local 166. Organizing fees in identical amounts were deducted from Local 166 members’ wages under the 2005-07 Alameda and Contra Costa Agreements. Because there was no increase from the 2005-07 Alameda and Contra Costa Agreements, the organizing fees included in the 2008-10 Alameda and Contra Costa Agreements do not exceed the amount approved at LIUNA’s general convention. Rather, the $0.60 and $1.10 organizing fees are properly characterized as preexisting financial obligations imposed by Local 166 on its own members to fund Local 166— not regional — organizing efforts.
Next, Corns argues that the district court erred in granting summary judgment with respect to the validity of the organizing fees provided for in the Alameda and Contra Costa Agreements because a factual dispute remains as to whether there was ever a valid secret ballot vote to approve these fees. Stated differently, Corns argues that, absent evidence of a prior secret ballot vote of Local 166 members, the inclusion of the organizing fees in the 2008-10 Alameda and Contra Costa Agreements constituted a continuing violation of the LMRDA. We conclude that Corns waived this argument by failing to raise it in the district court, and we accordingly decline to address it. In re Mercury Interactive Corp. Sec. Litig., 618 F.3d 988, 992 (9th Cir.2010).
Third, Corns argues that Resolution 12 requires that local unions — not their members — pay the organizing fees. Under the “financial burden” test, “[wjhether there has been an increase in dues must be determined not by who imposed the exaction but by the nature of the imposition and its direct effect upon the financial burden of the individual members.” King v. Randazzo, 234 F.Supp. 388, 394 (E.D.N.Y.1964); see also Patterson v. United Bhd. of Carpenters, 906 F.2d 510, 513 (10th Cir.1990) (indicating that several circuits have approved the “financial burden” test). Unlike a dues increase,
[a] true “per capita tax” is one which is levied by a parent labor organization upon a local union with which it is affiliated. It is not a tax levied by a parent or a coordinating union directly upon the members of its affiliated locals. It is paid to the parent body or authorized coordinating union from the dues collected by the local from its members and generally related to the numerical strength of the local. But it is not an additional sum charged directly to the member and it is not used as a subterfuge to increase dues.
King, 234 F.Supp. at 394. In King, the district council explicitly referred to the payment as a “per capita tax” in the applicable constitutional provision. Id. at 390. Applying the “financial burden” test, the *914 district court in King nonetheless concluded that the “[t]he term ‘per capita tax’ as used in this ease [was] not used in its traditional sense” but rather was “employed to denote the payment of dues by members of a local directly to an intermediate coordinating council within the [local union] structure.” Id. at 394.
We recognize that the “financial burden” test was formulated to prevent labor organizations from circumventing the LMRDA’s requirements by classifying a financial obligation as a per capita tax, which is not governed by the LMRDA, when, in reality, it functions as a dues increase on union members, which triggers § 101(a)(3)’s requirements. Seybert v. Lowen, 623 F.2d 780, 784 (2d Cir.1980) (explaining that the “financial burden” test was intended to distinguish “‘true’ per capita taxes from devices that, although labeled as ‘per capita taxes,’ actually were disguised dues increases which labor organizations sought to impose on their members without the necessity of first complying with the procedures mandated by 29 U.S.C. [§ ] 411(a)(3)”); Ranes, 317 F.2d at 918. In adopting Resolution 12, however, LIUNA complied with the LMRDA’s requirements and there is consequently no evidence that it sought to undermine the democratic processes protected by the statute. Thus, there is no basis for interfering with LIUNA’s implementation of a properly enacted organizing fee. Teamsters Joint Council No. 42 v. Int’l Bhd. of Teamsters, 82 F.3d 303, 306 (9th Cir.1996) (acknowledging the “well-established federal policy of avoiding unnecessary interference in the internal affairs of unions” and cautioning courts that, absent evidence of bad faith or special circumstances, they “must be careful not to undermine union self-government”); Reich v. Local 89, Laborers’ Int’l Union of N. Am., 36 F.3d 1470, 1476 (9th Cir.1994) (noting the countervailing policy of the LMRDA that “unions should be free to conduct their affairs so far as possible and the government should not become excessively involved in union politics”).
Finally, Corns contends that the district court erred in granting the Unions’ motion for summary judgment because the record does not demonstrate that the organizing fees collected under Resolution 12 were paid, in full, to the NCDCL’s regional organizing fund, as opposed to Local 166. Having reviewed the record, we conclude that Corns provided insufficient evidence to demonstrate that a genuine issue of material fact exists as to whether the organizing fees are remitted in their entirety to the NCDCL’s regional organizing fund.
Accordingly, we conclude that LIUNA complied with the LMRDA when it enacted an organizing fee payable by local union members by approving the fee by a majority of its delegates voting at a general convention. Because LIUNA properly implemented the organizing fee, the district court did not err in rejecting Corns’s challenge to the collection of this fee.
C. The NCDCL Dues Increase
Corns also contends that the NCDCL lacked the statutory authority to increase Local 166 members’ dues by a majority delegate vote at a special convention. According to Corns, the NCDCL is only permitted to increase the dues of its own members, who, in this case, consist of the district council’s fifteen affiliated local unions or the delegates from these local unions. The Unions, on the other hand, assert that the Uniform District Council and Uniform Local Union constitutions, which are binding on Local 166 members, empower the NCDCL to impose dues increases on members of affiliated local unions. In light of the plain text of the International Union Constitution and the *915 Uniform District Council constitutions, we conclude that the NCDCL violated the LMRDA when it imposed a dues increase on Local 166 members.
To properly impose a dues increase, the NCDCL, which is not a local labor organization, must comply with the requirements set forth in § 101(a)(3)(B) of the LMRDA. 29 U.S.C. § 411(a)(3)(B). The statute only permits a labor organization to impose a financial extraction, such as a dues increase, on its own members. Id. § 411(a)(3). As explained above, under the LMRDA, a “member” “when used in reference to a labor organization, includes any person who has fulfilled the requirements for membership in such organization, and who neither has voluntarily withdrawn from membership nor has been expelled or suspended from membership after appropriate proceedings consistent with lawful provisions of the constitution and bylaws of such organization.” Id. § 402(o). We therefore look to the NCDCL’s constitution and bylaws to determine who is a member of the labor organization.
The International Union and Uniform District Council constitutions explicitly define the membership of district councils, such as the NCDCL, as the delegates from affiliated local unions, who have been elected in the manner and number provided for in the Uniform District Council Constitution. Int’l Union Const, art. XIX, § 5; Unif. Dist. Council Const, art. I, § 2, art. TV, § 1. Yet, the Unions urge us to adopt the district court’s reasoning that Local 166 members are in substance members of the NCDCL because they are bound by the constitution and bylaws of all of the labor organizations in the union hierarchy. They argue that Local 166 members are effectively members of the NCDCL because they are bound by the terms of the Uniform Local Union Constitution, which in turn obligates members of Local 166 to abide by the International Union and Uniform District Council constitutions. Because Article II, § 2(e) and Article VIII, § 2 of the Uniform District Council Constitution and Article VIII, § 1 of the Uniform Local Union Constitution delegate the authority to establish and regulate dues and initiation fees to the NCDCL, the Unions contend that the NCDCL is authorized to impose dues increases payable by members of local unions.
Although we remain mindful of “the well-established federal policy of avoiding unnecessary interference in the internal affairs of unions and according considerable deference to the interpretation and application of a union’s rules and regulations,” Sergeant v. Inlandboatmen’s Union of the Pac., 346 F.3d 1196, 1200 (9th Cir.2003), we cannot adopt a position that so plainly conflicts with the express language of the constitutional provisions defining the NCDCL’s membership. Cf. Motion Picture & Videotape Editors Guild, Local 776 v. Int’l Sound Technicians, Local 695, 800 F.2d 973, 976 (9th Cir.1986) (“Absent a specific limitation in a union constitution, this court will not interfere with the efforts of a union’s leaders to manage the affairs of their organization.”). In addition to the provision addressing the composition of the NCDCL, we also note that the membership qualifications and obligations delineated in the Uniform District Council Constitution, which are relevant under the LMRDA for purposes of defining a labor organization’s membership, apply to union delegates, not individual union members.[12] Unif. Dist. Council Const, art. IV, §§ 3-1. We also find it significant that the International Union Constitution expressly pro *916 vides that the members of LIUNA consist of the members of its affiliated local unions. Int’l Union Const, art. I, § 1.
In so concluding, we agree with the Unions that Local 166 members must conform and comply with all of the Unions’ constitutions. See Intel v. Zohn Mfg. Co., 481 F.2d 181, 183 (10th Cir.1973) (concluding that local union members are bound by the constitutions and bylaws of the local union’s umbrella organization). But, the mere fact that Local 166 members are bound by the constitutions and bylaws of all of the labor organizations in the Unions’ hierarchy is not sufficient to bring them within the definition of “member” for purposes of the LMRDA. In light of these considerations, we reject the Unions’ circuitous approach of defining the NCDCL’s membership by cobbling together other constitutional provisions concerning the NCDCL’s powers and the obligations of its affiliated unions. Instead, we rely on the express provisions in the International Union and Uniform District Council constitutions defining membership.
We do not speculate whether the NCDCL, if it were to amend its constitution, could impose a dues increase on the members of only one of its affiliated local unions. We hold only that, although we generally accord deference to a labor organization’s interpretation of its own policies and provisions, there is no justification for an interpretation that squarely conflicts with the plain text of its constitutions and bylaws. We therefore conclude that the NCDCL violated § 101(a)(3) of the LMRDA when it imposed a dues increase on Local 166 members.
IV. CONCLUSION
In light of the plain text of § 101(a)(3)(B) and our holding in Moñ, we conclude that LIUNA complied with the LMRDA when it approved an organizing fee payable by Local 166 members by a majority vote of its delegates at a general convention. We further conclude that the NCDCL lacked the statutory authority to impose a dues increase on Local 166 members because they are not also members of the NCDCL. Accordingly, the district court’s grant of summary judgment is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.
AFFIRMED in part; REVERSED in part; and REMANDED. Each side shall bear their own costs on appeal.

. The parties filed excerpts of the Unions’ respective constitutions in the district court. Following oral argument, we requested that the parties file the full texts of the International Union Constitution, the Uniform District Council Constitution, and the Uniform Local Union Constitution. We deem it appropriate to take judicial notice of these documents. Fed.R.Evid. 201(b), (c)(1), (d); see also United States v. Espinoza-Morales, 621 F.3d 1141, 1150 (9th Cir.2010) (taking judicial notice of documents submitted after oral argument).

. The number of delegates from each local union is based, in part, on membership. Unif. Dist. Council Const, art. IV, § 3. The elected local union business manager is automatically a delegate to the NCDCL. Unif. Local Union Const, art. IV, § 4(E)(11), art. VI, § 4(b). Local unions may designate either the elected president or the elected secretary-treasurer as an additional delegate. Id. art. VI, § 4(b). Other delegates, if necessary, are elected by local union members as provided by the Uniform Local Union Constitution. Id. Local 166 is represented by two of the NCDCL's sixty delegates.

. At some point between March and May 2008, LIUNA’s international president transferred the former members of Local 36, who had previously merged with Laborers Local Union No. 270, to Local 166. Local 36's former members continued to work under collective bargaining agreements that remained in effect following the merger of the two local unions.

. Local 166’s sergeant-at-arms conducted the standing vote, which resulted in thirty votes in favor of the 2008-10 Local 166 Agreements and twenty-nine votes against. Corns challenged the vote on the ground that the sergeant-at-arms was the son of Local 166's business manager. At the business manager's request, the NCDCL’s assistant business manager requested the approval of the membership to take another standing vote count. *907 Following the membership's approval of his request, the membership also approved a request to permit an NCDCL executive board member to take the count with the NCDCL's assistant business manager. The second standing vote resulted in thirty-six votes in favor of, and thirty votes opposed to, the 2008-10 Local 166 Agreements.

. The LMRDA also includes a private right of action authorizing any aggrieved person to bring a civil action in a district court of the United States for any violation of the Act. 29 U.S.C. § 412.

. Except in the case of a federation of national or international labor organizations, the rates of dues and initiation fees payable by members of any labor organization ... shall not be increased, and no general or special assessment shall be levied upon such members, except—
(A) in the case of a local labor organization, (i) by majority vote by secret ballot of the members in good standing voting at a general or special membership meeting, after reasonable notice of the intention to vote upon such question, or (ii) by majority vote of the members in good standing voting in a membership referendum conducted by secret ballot; or
(B) in the case of a labor organization, other than a local labor organization or a federation of national or international labor organizations, (i) by majority vote of the delegates voting at a regular convention, or at a special convention of such labor organization held upon not less than thirty days' written notice to the principal office of each local or constituent labor organization entitled to such notice, or (ii) by majority vote of the members in good standing of such labor organization voting in a membership referendum conducted by secret ballot, or (iii) by majority vote of the members of the executive board or similar governing body of such labor organization, pursuant to express authority contained in the constitution and bylaws of such labor organization. ...
29 U.S.C. § 411(a)(3).

. The LMRDA defines a "labor organization” as "a labor organization engaged in an industry affecting commerce and includes any organization of any kind, any agency, or employee representation committee, group, association, or plan so engaged in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours, or other terms or conditions of employment, and any conference, general committee, joint or system board, or joint council so engaged which is subordinate to a national or international labor organization, other than a State or local central body.” Id. § 402(i). ■

. Under the LMRDA, a " '[mjember’ or 'member in good standing’, when used in reference to a labor organization, includes any person who has fulfilled the requirements for membership in such organization, and who neither has voluntarily withdrawn from membership nor has been expelled or suspended from membership after appropriate proceedings consistent with lawful provisions of the constitution and bylaws of such organization.” Id. § 402(o).

.A "secret ballot” is defined as "the expression by ballot, voting machine, or otherwise, but in no event by proxy, of a choice with respect to any election or vote taken upon any matter, which is cast in such a manner that the person expressing such choice cannot be identified with the choice expressed.” Id. § 402(k).

. The concurrence suggests an interpretation of the statute that does not account for its plain text, particularly the word "or" that connects 29 U.S.C. § 411(a)(3)(A) and (B). We place considerable importance on the precise text of the statute, and therefore do not find the concurrence's interpretation of the statute to be persuasive.

. The concurrence overlooks this critical aspect of our analysis. Union members pay fees and dues, but they receive the benefit of collective power and representation. And, contrary to the concurrence’s assertion, the stated purpose of the LMRDA is not “to protect union members against increases in dues and fees.” Rather, the purpose of the LMRDA is to ensure that unions are democratically governed. The purpose of § 103(a)(3), in particular, is to protect union members from arbitrary or unilateral extractions which, by their very nature, are not democratically approved. There is nothing in our analysis which would permit a labor organization to bypass member participation, through either a direct vote or a representative vote, when increasing members’ dues and fees.

. For this reason, we disagree with Coms’s characterization that the affiliated local unions are the members of the NCDCL for purposes of the LMRDA.