# United States Court of Appeals
## For the First Circuit

No. 18-1038

PHARAMOND CONILLE; YVES RIGAUD; MICHELET AUGUSTE; JACQUES LARAQUE; GUY RAPHAEL; JEAN LOUIS; JAMES SHEA; ELGA BERNARD; HODELIN AUBOURG; GABRIEL BERNARD; VERLEEN LEWIS; CARMESUEZ MICHAUD; KALLOT JEAN-FRANCOIS; MONIQUE MODAN; JOESEPH BERLUS; MARIE AVELINE FORTUNAT; VALENTINE DUBUISSON; FRANCHETTE DORSAINVIL; SALLY ROGERS; STANLEY SIENKIEWICZ; YVONNE VASSELL; LOCAL 402, AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES,

Plaintiffs, Appellees,

v.

COUNCIL 93, AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES; AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Howard, Chief Judge,
Torruella and Kayatta, Circuit Judges.

Paul F. Kelly, with whom Sasha N. Gillin and Segal Roitman, LLP were on brief for appellants.
Mark D. Stern, with whom Mark D. Stern P.C., Arthur L. Fox, II, and Lobel, Novins & Lamont, LLP were on brief, for appellees.
Michael J. Goldberg on brief for The Association for Union Democracy, amicus curiae.

August 24, 2020

**HOWARD**, **Chief Judge**.  This appeal requires us to consider the proper role of the courts in adjudicating an intra-union dispute that implicates both Titles I and IV of the Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA").  The case arises out of a dispute between Council 93, a regional division of the American Federation of State, County and Municipal Employees ("AFSCME"), and one of its local divisions, Local 402, over the allocation of seats on Council 93's governing executive board.  The plaintiffs, Pharamond Conille and other members of Local 402, brought suit in the District of Massachusetts, alleging that the allocation of seats on the executive board violated their right to an equal vote under both Title I of the LMRDA, 29 U.S.C. § 411, and the AFSCME constitution.  The district court agreed and ordered Council 93 to reconstitute its executive board "within one year so that there may be proper proportional representation for its constituent locals and members."  Conille v. Council 93, Am. Fed'n of State, Cty. & Mun. Emps., No. 17-11495, 2018 WL 2223672, at *5 (D. Mass. May 15, 2018).

After careful consideration, we conclude that, even if the composition of Council 93's executive board violates the equal rights provision of Title I, the remedy for any such violation can, in the first instance, be implemented only by the Secretary of Labor under the remedial provisions of Title IV.  We also conclude that the plaintiffs have not shown that the union

- 3 -

constitution supports their claims. We therefore reverse the district court's judgment on all claims except for Council 93's counterclaim, and remand for further proceedings.

## I.

We begin with a sketch of AFSCME's organizational structure and the pertinent facts underlying this case.

## A.

AFSCME is a large international trade union organization under the umbrella of the American Federation of Labor-Congress of Industrial Organizations ("AFL-CIO"). Representing public service employees throughout the United States, AFSCME is governed by a biennial convention composed of delegates elected by local unions in proportion to their membership. These delegates in turn elect an executive board composed of a president, a secretary-treasurer, and thirty-four vice presidents representing AFSCME's twenty geographical and five organizational legislative districts. Council 93 is the governing body for the legislative district covering Northern New England, and the Northern New England legislative district is represented by one vice president on the AFSCME executive board. The AFSCME executive board manages the day-to-day affairs of the union and serves as the union's governing body when the convention is not in session. Plaintiffs do not challenge the manner in which AFSCME selects its governing bodies and officers. Rather, they train their criticism on the methods

by which the governing bodies and officers of Council 93 are selected.

As the intermediate body governing of one of AFSCME's legislative districts, Council 93 is tasked with coordinating the activities of AFSCME's local unions ("locals"), which are the narrowest formally recognized components of AFSCME. Council 93 covers the Northern New England legislative district and represents locals in Maine, Massachusetts, New Hampshire, and Vermont. It consists of approximately 500 affiliated locals, representing approximately 45,000 members. Like AFSCME, Council 93 is governed by a biennial convention composed of delegates representing the locals that make up Council 93 and an executive board elected by the convention delegates.

In choosing Council officers, voting begins at the local union level, where each qualified union member votes to select the delegates representing that local. Plaintiffs offer no criticism of that process. The delegates then attend a regular convention every two years which, while in session, governs Council 93. They may also attend legislative conferences and special conventions. At the regular conventions, all delegates vote on all matters of union governance and possess the power to amend Council 93's governing constitution. They also select by a vote of all delegates the five principal officers of the Council (president, executive vice president, recording secretary, secretary-

treasurer, and sergeant-at-arms). For these decisions, each delegate's vote is weighted to approximate the number of members of the local represented by the delegate. Plaintiffs do not criticize this process, either. The five chosen principal officers lead the Council's executive board, to which forty-five vice presidents also belong. That executive board is responsible for the day-to-day governance of Council 93, and it is the selection of those vice presidents upon which plaintiffs focus their criticism.

To choose the vice presidents, Council 93's constitution divides the locals into thirteen legislative districts -- nine geographic and four organizational. These legislative districts do not have independent governing bodies; rather, they function solely as a way to divide delegates to nominate and elect members of the executive board. The Council 93 constitution allocates a specific number of vice president positions to each legislative district. The number allocated to each district bears little, if any, relationship to the number of members in that district. Rather, the allocations are artifacts of agreements made over time as locals have joined the Council. For example, a single vice president is chosen by the delegates representing over 1,800 members in the Vermont district, while four vice presidents are chosen by the delegates representing 1,500 employees in a

"Department of Mental Health" legislative district. It is this type of disproportionality that triggers plaintiffs' displeasure.

**B.**

Pharamond Conille and the other plaintiffs are members of the now-deactivated Local 402, a local labor union representing employees of the Massachusetts Department of Developmental Services ("DDS") who worked at the Walter E. Fernald State School in Waverly, Massachusetts. AFSCME chartered Local 402 in 1953, and until its deactivation, Local 402 maintained an affiliation with both AFSCME and Council 93. Conille and non-party Raymond McKinnon were the vice president and president, respectively, of Local 402 at the time of its deactivation in March 2017. Conille, 2018 WL 2223672, at *2. Conille also sat on the Council 93 executive board. Id. at *3–4.

**C.**

In February 2017, the Fernald Development Center closed permanently, and its employees, including the members of Local 402, were transferred to other state facilities and programs. Id. at *2-3. After Fernald's closure, certain members of the executive board for Council 93 recommended to AFSCME that Local 402 be deactivated because there were no longer any union members working within Local 402's jurisdiction. Id.

Conille and McKinnon objected to the deactivation; both wrote to several individuals within Council 93, as well as to

- 7 -

AFSCME's Charter and Constitution Department, opposing deactivation and requesting that Local 402's charter be updated to include several community worksites that Local 402 had been representing. Id. at *3. AFSCME declined this request on the basis that Council 93 opposed it. Id. In May 2017, a special assistant to the executive director of Council 93 sent an email to DDS's human resources department advising DDS of Local 402's deactivation. Conille, 2018 WL 2223672, at *3. A few weeks after this deactivation notice, Local 402 received an additional notice ordering it to return funds and property to Council 93. Id.

Shortly thereafter, McKinnon filed charges with AFSCME's judicial panel against Council 93 for interfering with the ability of Local 402's officers to perform their duties. Id. The judicial panel ultimately declined to take any action based on these charges, and the AFSCME secretary-treasurer instead issued a notice requiring the transfer of funds and property from the deactivated Local 402 to AFSCME. AFSCME also responded to objections lodged by Local 402 with a letter stating that the decision to deactivate Local 402 was made in accordance with the AFSCME constitution. Conille, 2018 WL 2223672, at *3. As a result of the deactivation, the charters of two other local unions -- Local 646 and Local 1730 -- were amended to allow those locals to absorb the members of Local 402. Id.

- 8 -

Conille became a member of Local 646 and, as a result, found his Council 93 executive board post in jeopardy. The Council 93 constitution prohibits two members from the same local from sitting on the executive board at the same time and one of Local 646's members was already serving on Council 93's executive board. Conille asserts that, at the end of the June 2017 executive board meeting, members of the board informed him that it would be his last meeting because Local 646 already had a member on the board. Conille, 2018 WL 2223672, at *4. Conille objected and, after the meeting, sent a letter to Council 93's president and vice president, arguing that their actions violated the AFSCME constitution and demanding that he be allowed to finish his term. Id. The president denied telling Conille that he would be removed and stated that the status of Conille's seat would be discussed at the next scheduled Council 93 executive board meeting. Id.

## II.

In August 2017, members of Local 402 filed a five-count complaint for injunctive, declaratory, and other relief against AFSCME and Council 93 on behalf of themselves and Local 402 challenging the local's deactivation and the manner in which vice presidents are elected to the Council 93 executive board. AFSCME in turn filed a counterclaim seeking to compel the plaintiffs to turn over any assets, accounts, books, and records of the deactivated local as required by the AFSCME constitution.

- 9 -

After a two-day bench trial, the district court issued an oral decision, subsequently supplemented by a written order of findings of fact and conclusions of law. Conille, 2018 WL 2223672. With respect to the challenge to the manner in which vice presidents are elected to Council 93's executive board, the district court concluded that proportionality of representation "simply did not exist" on the board and that, instead, "[r]epresentation seems to be nothing more than a hodge-podge of historic deals made as unionized employees became locals within AFSCME." Id. at *4. The court also ordered that all interim rulings of the incumbent board would be "provisional," unless and until approved by a new, proportionately constituted board. See Id. at *1. Though it did not find that strict proportionality was required, the district court held that there "must be a neutral principle that would justify the gross disproportionality between membership and board seats on Council 93 allocated to the legislative districts." Id. at *5. To remedy the failing that it discerned, the district court ordered Council 93 to reconstitute the executive board "so that there may be proper proportional representation for its constituent locals and members." Id.

As to the deactivation of Local 402, the district court found that the plaintiffs had failed to exhaust internal union remedies because they had not requested a formal appeal to the international executive board. Id. It also held that Local 402

- 10 -

was properly deactivated in accordance with the AFSCME constitution and the LMRDA and that it would defer to Council 93's and AFSCME's reasoning for deactivating the local. Conille, 2018 WL 2223672, at *6. Because Local 402 agreed during trial to turn over funds and property to AFSCME if the court concluded that the deactivation was proper, the district court dismissed AFSCME's counterclaim as moot. Id. at *7.

Council 93 and AFSCME timely appealed the district court's rulings with respect to the composition of Council 93's executive board and the dismissal of the counterclaim. The plaintiffs separately appealed the district court's findings with respect to Local 402's deactivation.[1] In deciding the plaintiffs' appeal with respect to Local 402's deactivation, we concluded that "Local 402 exercised its right to appeal to the [international executive board]." Conille v. Council 93, Am. Fed'n of State, Cty. & Mun. Emps., 935 F.3d 1, 9 (1st Cir. 2019). "The fact that Local 402 was never afforded an appeal is a breach of contract, actionable under Section 301(a) of the [Labor Management Relations Act]." Id. We remanded that portion of the case to the district court to order AFSCME to either rescind Local 402's deactivation or proceed in the ordinary course to hear the appeal. Id. Because AFSCME's counterclaim depends on the determination of whether

---

[1] In an order issued during the pendency of this appeal, we allowed the plaintiffs' appeal to proceed separately.

- 11 -

Local 402's deactivation was proper, any claim regarding failure to return the funds is not yet ripe, so we accordingly affirm the denial of the counterclaim and direct the district court to dismiss the counterclaim without prejudice.

## III.

We focus our attention on the plaintiffs' claim that the allocation of seats on Council 93's executive board violates the guarantees of equal protection and the right to vote that plaintiffs say are codified in Title I of the LMRDA, 29 U.S.C. § 411(a)(1), and in the AFSCME constitution. The plaintiffs say that these guarantees have been breached because the allocation is neither proportional to the membership of each group of locals nor governed by a neutral principle. The parties have not objected to the district court's findings of fact. Consequently, in evaluating this claim, we accept the district court's factual determinations and will review de novo the district court's construction of the text of the LMRDA and the union constitution. See Buntin v. City of Boston, 857 F.3d 69, 72 (1st Cir. 2017) ("Because the question is one of statutory interpretation, we exercise de novo review."); Calderón-Ortega v. United States, 753 F.3d 250, 252 (1st Cir. 2014) ("[W]e review the trier's conclusions of law de novo.").

## A.

Originally enacted in 1959, the LMRDA "was Congress' first major attempt to regulate the internal affairs of labor

- 12 -

unions."  <u>Local No. 82, Furniture & Piano Moving, Furniture Store</u>
<u>Drivers</u> v. <u>Crowley</u>, 467 U.S. 526, 528 (1984).  It was designed to
"protect[] the equal rights of union members to participate in the
internal affairs of their unions" and "to eliminate or prevent
improper practices on the part of labor organizations." <u>McCafferty</u>
v. <u>Local 254, Serv. Emps. Int'l Union</u>, 186 F.3d 52, 57 (1st Cir.
1999) (quoting 29 U.S.C. § 401).

As relevant here, the LMRDA includes two separate
provisions, located in Titles I and IV, regulating a union's
internal governance structure and the conduct of its elections.
The first, contained in Title I, the so-called "Labor Bill of
Rights," guarantees to all union members "equal rights and
privileges within [the] organization to nominate candidates, to
vote in elections or referendums . . . , and to participate in the
deliberations and voting upon the business of such meetings,
subject to reasonable rules and regulations in such organization's
constitution and bylaws."  29 U.S.C. § 411(a)(1).  As the name
suggests, the focus of Title I is to ensure equal treatment among
union members and to guarantee union members' rights to speak and
assemble without fear of improper retaliation or discipline from
within the labor organization. <u>McCafferty</u>, 186 F.3d at 57 (citing
<u>Molina</u> v. <u>Union de Trabajadores de Muelles y Ramas Anexas,</u>
<u>Local 1740</u>, 762 F.2d 166, 167 (1st Cir. 1985)); <u>cf.</u> <u>United</u>
<u>Steelworkers</u> v. <u>Sadlowski</u>, 457 U.S. 102, 109 (1982) ("[W]e do not

- 13 -

believe that [Title I] should be read as incorporating the entire body of First Amendment law, so that the scope of protections afforded by the statute coincides with the protections afforded by the [federal] Constitution.").  By its terms, Title I supersedes any contrary provision in a union's internal governance documents and grants individual union members the right to sue in federal court to enforce its guarantees.  29 U.S.C. § 411(a)(4), (b).

While Title I establishes the basic rights to which all union members are entitled, Title IV "sets out detailed regulations 'aimed solely at protecting union democracy through free and democratic elections.'"  McCafferty, 186 F.3d at 57 (quoting Molina, 762 F.3d at 167).  Most relevant to our present inquiry, Title IV provides that "[o]fficers of intermediate bodies . . . shall be elected . . . by secret ballot among the members in good standing or by labor organization officers representative of such members."  29 U.S.C. § 481(d).  Title IV also sets forth certain minimum requirements for union elections, including the timing and manner of elections for union officers at the national, intermediate, and local levels.  Id.; see also Am. Fed'n of Musicians v. Wittstein, 379 U.S. 171, 181 (1964) ("Title IV contains elaborate statutory safeguards for the election of union officers."); Harrington v. Chao, 280 F.3d 50, 53 (1st Cir. 2002) ("Title IV of the LMRDA . . . establishes minimum standards for the election of union officers." (citation omitted)).  As for

enforcing these rights, "[the] primary responsibility . . . [is] lodged with the Secretary of Labor."  Crowley, 467 U.S. at 528; see also Int'l Org. of Masters v. Brown, 498 U.S. 466, 476 (1991) (noting that, with the exception of the union's obligation to mail candidates' campaign literature, "other rights created by Title IV . . . are judicially enforceable only in actions brought by the Secretary of Labor"); Wirtz v. Local 153, Glass Bottle Blowers Ass'n, 389 U.S. 463, 471 (1968) ("In the end there emerged a general congressional policy to allow unions great latitude in resolving their own internal controversies, and, where that fails, to utilize the agencies of Government most familiar with union problems to aid in bringing about a settlement through discussion before resort to the courts." (internal quotations and citations omitted)).

The statutory rights contained within Title I and Title IV can sometimes seem to overlap, see Molina, 762 F.2d at 167-68, especially in cases like this one, where the alleged wrongful conduct implicates both the structure of union elections and the rights of individual union members to vote for the officers of intermediate bodies.  In terms of the substance of the rights guaranteed, it is thus hardly surprising that the line between a Title I and a Title IV violation is muddy.  In Molina, we suggested that a right was guaranteed by Title I if it was specific to an individual member or group of members: "[t]he typical Title I

- 15 -

claim," we held, "involves an allegation of unequal treatment among union members." Id. at 168 (citing Calhoon v. Harvey, 379 U.S. 134, 139 (1964)). Because the union member "[did] not argue that a rule was applied unevenly but that an evenly applied rule was activated for an improper purpose," the right asserted derived from Title IV, rather than from Title I. Id. at 169; see also Fritsch v. Dist. Council No. 9, Bhd. of Painters, 493 F.2d 1061, 1063 (2d Cir. 1974) ("[T]he essence of Title I is the command not to discriminate against members and classes of members in their right to vote and nominate."). In other words, Molina requires that we ask whether the violation asserted is personal to the individual union member plaintiff or is instead shared by all members who are entitled to representation by a particular body.

This case is something of a hybrid. It alleges that specific groups of members -- those in certain locals -- are harmed by the policy that could arguably be said to deny them equal representation, à la Title I. Conversely, the election structure applies evenly to all past, present, and future elections writ large and, as a rule, may not have been enacted to further any proper purpose, which suggests Title IV might be the better fit.

We need not parse this divide, however, because whether the injury asserted is one that falls within Title I's guarantees is not our sole inquiry. To decide whether the plaintiffs may maintain an action under Title I, we also need to examine the

remedy they seek, as Title I contains a separate limitation on the power of courts to resolve the dispute: the complaint must seek "appropriate" relief under that Title. See Crowley, 467 U.S. at 538. Where that condition is not satisfied, "even when Title I violations are properly alleged and proved," the suit cannot be "maintained." Id. at 543.

Crowley makes clear the need to consider the appropriateness of relief in determining the extent of our jurisdiction under Title I. Id. ("[W]hether a Title I suit may properly be maintained by individual union members . . . depends on the nature of the relief sought."). At issue in Crowley was whether, under Title I, union members who did not have dues receipts could be prohibited from participating in the union officer nomination process, and the district court entered an injunction while a union election was ongoing to preserve its jurisdiction to decide the issue. Id. at 531–32. The Supreme Court reversed, holding that "such judicial interference in an ongoing union election is not appropriate relief under" Title I. Id. at 529. The ongoing nature of the elections, however, was only one factor that contributed to the Court's conclusion that the relief was inappropriate; the case did not turn on the fact that the elections were ongoing per se. See id. at 546 (noting that Title I suits may be maintained during ongoing elections). Rather, Title I expressly limits itself only to cases where "relief

that may be ordered by a District Court" is "'appropriate' to any given situation." Id.at 538 (emphasis added). The Court applied that rule to find that the district court's injunction of an ongoing election was inappropriate.

So, to decide the limits of our jurisdiction, we must look to what makes relief "appropriate" under Title I. Crowley reasoned that the enforcement and remedial provisions of Title I cannot be interpreted in isolation but rather must be construed in conjunction with the protections afforded in Title IV. See id. at 538-39. It then went on to discuss how broader remedial powers to oversee elections have been vested with the Secretary of Labor under Title IV. Id. at 539-40. It is these remedial powers that can preclude relief under Title I. Like "post-election" challenges to union elections, "Congress would [also] not have considered" other remedies available under Title IV -- enjoining an ongoing election, as was the case in Crowley, or "requiring and judicially supervising a new election" -- "to be 'appropriate' relief under Title I." Id. at 544. As the Court recognized:

> nothing in the flurry of activity that surrounded enactment of Title I . . . indicates that Congress intended that Title to reverse this consistent opposition to court supervision of union elections. Although the enactment of Title I offered additional protection to union members, including the establishment of various statutory safeguards effective during the course of a union election, there is no direct evidence to suggest that Congress believed that

> enforcement of Title I would either require or allow courts to pre-empt the expertise of the Secretary and supervise their own elections.

Id. at 545-46 (citations omitted). To be sure, the exclusivity provision of Title IV, codified in 29 U.S.C. § 483, applies on its face only to challenges to past elections. However, the Court in Crowley rejected a reading of this section that would allow individual union members to seek relief in a court, rather than from the Secretary of Labor, for alleged violations that implicated both Title I and Title IV, as long as those members were not explicitly seeking to undo a completed election. Such a reading would necessarily require the courts, in cases like this one, to "pre-empt the expertise of the Secretary and supervise their own elections." Id

Indeed, the remedy sought and awarded by the district court in this case far exceeded what courts can do in Title I cases. First, by deeming actions of the incumbent board provisional and subject to ratification by a later board, the district court's remedy effectively deprives the prior election of its legitimacy and full effect. Second, by ordering a newly constituted board, the make-up of which is subject to the court's approval, the remedy effectively puts the district court in the position of supervising a new election with significant discretion to approve, or not, its processes and results. See Crowley, 467 U.S. at 548 (discussing how a "pre-election challenge" asking "the

court to enjoin the union from preparing for or conducting any election until the rules [a]re revised" is similarly barred (citing Calhoon, 379 U.S. 134 (1964))); Knisley v. Teamsters Local 654, 844 F.2d 387, 390 (6th Cir. 1988) ("Title IV also precludes suits brought under Title I where a plaintiff is challenging the validity of an upcoming election and is seeking an injunction against that election." (citing Crowley, 467 U.S. at 551)). For orders "directing an election," 29 U.S.C. § 482(d), "challenging an election already conducted," id. § 483, or the equivalent thereof, the remedy is committed to the Secretary to pursue under Title IV. In such cases, a Title I suit cannot properly be maintained, and the case must be dismissed. See BLE Int'l Reform Comm. v. Sytsma, 802 F.2d 180, 186 (6th Cir. 1986) ("If Title IV rights are implicated, resulting in an overlap between Title IV and Title I rights, then Crowley requires the litigant to utilize the enforcement procedures in [Title IV]."); see also Calhoon, 379 U.S. at 140 ("Section 402 of Title IV . . . sets up an exclusive method for protecting Title IV rights, by permitting an individual member to file a complaint with the Secretary of Labor . . ."); Bradley v. Am. Postal Workers Union, 962 F.2d 800, 802 (8th Cir. 1992) ("If a lawsuit alleges Title I violations, but is, in effect, a Title IV suit, the suit has been improperly brought, and the court has no jurisdiction over the action.").

Our conclusion that the remedy sought is not appropriate under Title I is consistent with our strong policy of not interfering in internal union matters. See, e.g., Dow v. United Bhd. of Carpenters and Joiners, 1 F.3d 56, 58 (1st Cir. 1993) ("It is common ground that a labor union's internal affairs comprise an enclave best kept free from judicial intrusion."); Local No. 48, United Bhd. of Carpenters & Joiners v. United Bhd. of Carpenters & Joiners, 920 F.2d 1047, 1051 (1st Cir. 1990) ("There is a well-established, soundly based policy of avoiding unnecessary judicial intrusion into the affairs of labor unions. . . . While the LMRDA is intended to protect union members against overreaching by their leaders, we have long since settled that the statute does not comprise a 'license for judicial interference in the internal affairs of the union.'" (citations omitted) (quoting Howard v. United Ass'n of Journeymen & Apprentices, Local No. 131, 560 F.2d 17, 21 (1st Cir. 1977))).

Our conclusion is also reinforced by the fact that, if the composition of the Executive Board violates the LMRDA, an adequate remedy exists under Title IV. The LMRDA vests in the Secretary of Labor the authority to oversee the internal governance of a union, 29 U.S.C. § 482, including authority to determine whether the structure of weighted delegates used by Council 93 to

elect the executive board vice presidents can fairly be said to be "representative of [union] members."  Id. § 481(d).[2]

**B.**

In the alternative, plaintiffs contend that the structure of Council 93's Executive Board violates the AFSCME constitution, particularly Paragraph 4 of its "Bill of Rights,"[3] which provides that "[m]embers shall have the right to fair and democratic elections, at all levels of the union.  This includes due notice of nominations and elections, equal opportunity for competing candidates, and proper election procedures which shall be constitutionally specified."

---

[2]  Council 93 also argues that the plaintiffs are not entitled to relief because they failed to exhaust internal union remedies before seeking judicial review.  The district court's lack of findings on exhaustion, at most, can be taken to mean that exhaustion was not required under the discretionary exhaustion provisions of Title I.  However, Title IV requires exhaustion of internal remedies before union members may seek redress from the Secretary of Labor.  29 U.S.C. § 482(a).  Because we direct that the LMRDA claim be dismissed in its entirety with the option to seek review from the Secretary of Labor under Title IV, we decline to exercise jurisdiction to determine whether Title IV's mandatory exhaustion requirements have been satisfied.

[3]  Plaintiffs also contended in the district court that they are entitled to equal protection rights in officer elections under Paragraph 7 of the AFSCME Bill of Rights, which states that "[a]ll members shall have an equal right to vote and each vote cast shall be of equal weight."  However, they advance only their argument under Paragraph 4 (the right to fair and democratic elections) on appeal.  Nevertheless, defendants focus on plaintiffs' allegations under Paragraph 7, arguing that the union's interpretation of Paragraph 7 is reasonable.

The AFSCME constitution requires internal exhaustion prior to bringing a claim in court under one of its provisions. Title IV of the LMRDA also requires exhaustion of internal union remedies by parties alleging a "violation of the constitution and bylaws of the labor organization pertaining to the election and removal of officers." 29 U.S.C. § 482(a).[4] Although the record is not entirely clear, we will assume, favorably to plaintiffs, that they first unsuccessfully pursued their claim internally, as

_____

[4] We have jurisdiction to decide some disputes between a parent and subsidiary union body under the union's constitution under the National Labor Relations Act, 29 U.S.C. § 185. See United Ass'n of Journeymen & Apprentices v. Local 334, United Ass'n of Journeymen & Apprentices, 452 U.S. 615, 619, 627 (1981) (concluding that, because union constitutions are "labor contracts," the court has jurisdiction to enforce their terms); Lydon v. Local 103, Int'l Bhd. of Elec. Workers, 770 F.3d 48, 54 (1st Cir. 2014) (same); cf. Padilla-Gonzalez v. Local 1575, 635 F. Supp. 2d 105, 109-110 (D.P.R. 2009) (concluding that a local's constitution is a contract between a union and its members, not between two unions). Because we ultimately conclude that plaintiffs have failed as a matter of law on their claim, we need not decide whether Title IV is also the exclusive remedy for this type of constitutional claim or whether § 185 provides an exception. See Cowels v. FBI, 936 F.3d 62, 67 (1st Cir. 2019) ("Where a question of statutory jurisdiction is complex, but the merits of the appeal are 'easily resolved against the party invoking [] jurisdiction,' we can assume jurisdiction for purposes of deciding the appeal." (quoting Méndez-Núñez v. Fin. Oversight & Mgmt. Bd. (In re Fin. Oversight & Mgmt. Bd.), 916 F.3d 98, 114 n.13 (1st Cir. 2019)) (alteration in original)). Compare 29 U.S.C. § 481(e) (characterizing the right for elections to "be conducted in accordance with the constitution and bylaws of such organization" as a right under Title IV, to be enforced by the Secretary of Labor), with id. § 483 ("Existing rights and remedies to enforce the constitution and bylaws of a labor organization with respect to elections prior to the conduct thereof shall not be affected by the provisions of this subchapter.").

- 23 -

required under the union constitution, before seeking redress in the courts.

The merits of plaintiffs' claim under the AFSCME constitution turns on the question of the proper interpretation of Paragraphs 4 and 7 of the constitution's Bill of Rights. When reviewing a union's interpretation of its own constitution, we defer to that interpretation unless it is plainly unreasonable. See Local No. 48, 920 F.2d at 1052 ("[T]he critical question, uniformly, is whether the stated reason for the action was facially sufficient under the instrument of governance, or put another way, whether there was arguable authority for the officer's act from the officer's viewpoint at the time." (internal quotation marks omitted)).

We begin with the constitution's text, see United States v. Charter Int'l Oil Co., 83 F.3d 510, 517 (1st Cir. 1996), noting at the outset the absence of any express guarantee of equal or proportional representation on its executive board or on any of its or its subsidiaries' governing bodies, including the subsidiaries' executive boards. This silence contrasts with the text of paragraph 7 of the AFSCME Bill of Rights, which states that "[a]ll members shall have an equal right to vote and each vote cast shall be of equal weight" specifically on issues pertaining to the collective bargaining of contracts, memoranda of understanding, agreements affecting members' wages, hours, or any

other terms of employment.  The union thus knew precisely how to require equally weighted votes on an issue within the constitution if it wished to do so; instead, it chose to use only the term "fair and democratic" when referring to how elections of its officers must be conducted.

So, we ask if this term by itself renders supererogatory the need to include explicitly the right to proportional representation or an equal vote.  See Ramos v. Louisiana, 140 S. Ct. 1390, 1400 (2020) (suggesting that, with respect to certain rights, the absence of an explicit grant of that right in the text of the Constitution does not imply the right does not exist, but rather, supports the inference that the right "was so plainly included" that stating it explicitly would be "surplusage").

We think that it does not.  We can assume the term "democratic," by itself, implies a relatively equal right to vote on such matters as one is entitled to vote on, but it is too much of a stretch to say that it must also imply proportional representation on the executive board.  The United States is generally considered to be a democracy in normal parlance, notwithstanding the effectively disproportionate representation in the Senate and the Electoral College.  See Lyman v. Baker, 954 F.3d 351, 371 (1st Cir. 2020) ("The United States' system of representative democracy [includes] . . . the Electoral College and . . . Senate.").  Similarly, the term "fair" may suggest some

restraint on the procedures used for voting. Paragraph 4 thus requires, as examples, "due notice of nominations and elections, equal opportunity for competing candidates, and proper election procedures which shall be constitutionally specified." While this list is non-exhaustive, it would have been rather simple for the union to include within it the requirement of equal or proportional representation on all governing bodies, as it did in Paragraph 7 for labor concerns and within this paragraph for competing candidates. Yet, it did not.

The defendants' position that the voting system used to select officers of Council 93's executive board is fair finds further support in the fact that those procedures themselves are approved and subject to change by the convention, in which voting is weighted just as plaintiffs would have it be -- proportionate weight is assigned to the votes of convention delegates based on the number of members represented.

Moreover, the actual behavior being challenged is not precisely an undemocratic or unfair election as a result of an unequally weighted vote. In choosing delegates to the Council 93 convention, union member votes are weighted equally, and these conventions, like a parliament, carry out many of the important legislative powers of the union. Similarly, the five senior officers on Council 93's executive board are chosen according to an equally weighted vote of convention delegates, in much the way

that a prime minister might be chosen by a parliament composed of equally weighted votes. It is only the selection of vice presidents to represent the legislative districts that is being challenged.

We have a difficult time saying that the members' right to "fair and democratic elections" necessarily guarantees equal representation on this subordinate body of executive officials. That a cabinet may be made up of appointed officials who do not proportionally reflect the full constituency does not mean that the underlying election was not fair and democratic. The constitutional clause at issue here guarantees only that, when members vote, the process is fair and democratic. The plaintiffs have not contended that their actual elections are otherwise, only that every officer must proportionally represent the constituency. As to that contention, they point to nothing in their constitution that imposes that requirement on Council 93 or any of AFSCME's subordinate bodies.

AFSCME itself also allocates seats and voting for positions on its own executive board in a manner that belies equal representation of every union member, as plaintiffs concede. Although plaintiffs suggest that the ASFCME executive board is somehow more proportional because it is a "hybrid house-senate-like" system, this is nothing more than a particular type of disproportionality. And plaintiffs do not offer any basis in the

AFSCME constitution to suggest how much proportionality is enough to be "fair and democratic." One would expect to find some good reason why AFSCME would view its constitution as outlawing a practice by the Council that it allows itself. Plaintiffs offer no such reason, and we are not willing to create one sua sponte, especially where we are to defer to AFSCME's reasonable interpretations of its constitution. See, e.g., Vestal v. Haffa, 451 F.2d 706, 709 (6th Cir. 1971) ("Courts are reluctant to substitute their judgment for that of union officials in the interpretation of a union constitution, and will interfere only where the official's interpretation is not fair or reasonable."); cf. Coleman v. Miller, 307 U.S. 433, 454-55 (1939) (holding that a "lack of satisfactory criteria for a judicial determination," inter alia, favors deference to other bodies in deciding what counts as a "Republican Form of Government").

Of course, the district court reasoned that the voting structure need not be precisely proportional but should at least have "some neutral principle that justifies weighted voting," and it found no such rationale besides a "hodge-podge of historic deals." But negotiation and deal-work are the very heart of what unions do. In fact, plaintiffs imply the need to allow unions to make such compromises by suggesting that AFSCME's executive board representation is not problematic because it is like the U.S. House and Senate, which itself is nothing more than an historic deal.

- 28 -

See Ronald J. Krotoszynski, Jr., <u>Reconsidering the Nondelegation Doctrine: Universal Service, the Power to Tax, and the Ratification Doctrine</u>, 80 Ind. L.J. 239, 252 (2005) (discussing how the apportionment of seats in the U.S. House and Senate was part of a complicated "deal" involving the balance of power between competing factions).  While we recognize that Council 93 is constrained in the deals it can negotiate by the AFSCME constitution, we are hesitant to retroactively read the terms "fair and democratic" to invalidate the bargained-for exchanges that the union members agreed to over the years, especially when AFSCME has made no indication that it believes the term carries such weight and has opted not to restrict its councils in this way.  If AFSCME had wanted to tie the hands of its councils in this matter, it certainly could have stepped in and chosen not to approve the provisions in the Council 93 constitution incorporating these deals.  Its acquiescence is entitled to some consideration.

For all of these reasons, we reject the plaintiffs' claim that the AFSCME constitution can only be reasonably read as outlawing the practice adopted by the Council 93 convention for filling positions on the executive board.

### IV.  CONCLUSION

For the foregoing reasons, we <u>reverse</u> the judgment of the district court on all but the counterclaim, which we <u>affirm</u> on other grounds.  We leave it to plaintiffs, should they so desire,

to seek such if any relief from the Secretary of Labor as the Secretary may deem appropriate under Title IV of the LMDRA. The parties shall bear their own costs of this appeal.